IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

TYSON N. WATSON,
      Plaintiff,

vs.                                    Case No.:  3:12cv365/MCR/EMT

LIEUTENANT EDELEN, et al.,
      Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Tyson N. Watson ("Watson"), an inmate of the Florida Department of Corrections ("FDOC"), proceeds pro se and in forma pauperis in this action brought pursuant to 42 U.S.C. § 1983.  Watson sues Lieutenant Christopher Edelen ("Lieutenant Edelen"), Correctional Officer Robert Johnson ("Officer Johnson"), Sergeant Daryle Rogers ("Sergeant Rogers"), and Senior Licensed Practical Nurse Bobby Hawkins ("SLPN Hawkins"), all of whom were employed by the FDOC at Santa Rosa Correctional Institution ("SRCI") at the time of the events giving rise to this action.  Presently before the court is Defendants' Motion for Sanctions or Alternative Motion for Summary Judgment (doc. 124), to which Plaintiff has responded in opposition (doc. 155).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B), (C), and Fed. R. Civ. P. 72(b).  For the reasons set forth below, the court recommends that Defendants' motion for summary judgment be granted in part and denied in part.

I.      BACKGROUND AND PROCEDURAL HISTORY

Watson initiated this action on July 23, 2012, by filing a civil rights complaint under § 1983 (doc. 1).  His Second Amended Complaint (doc. 33), which is the operative pleading, includes three counts:

Count 1:  Defendants Edelen and Johnson used excessive force against him on March 1, 2012, and Defendants Edelen, Rogers, and Hawkins used excessive force against him on March 4, 2012, in violation of the Eighth Amendment;

Count 2:  Defendants Edelen and Hawkins were deliberately indifferent to his serious mental health needs on March 1, 2012, and Defendants Edelen, Rogers, and Hawkins were deliberately indifferent to his serious mental health needs on March 4, 2012, in violation of the Eighth Amendment; and

Count 3:  Defendants Edelen, Rogers, and Hawkins were deliberately indifferent to his serious medical needs on March 4, 2012, in violation of the Eighth Amendment.

(*id.* at 19–20).[1]  Suing Defendants in their individual capacities (*see id.* at 1), Watson seeks nominal, compensatory, and punitive damages, as well as costs and attorney's fees (*id.* at 19, 21).

Defendants filed a Motion for Sanctions or Alternative Motion for Summary Judgment on April 14, 2014 (doc. 124).  They argue they are entitled to dismissal of some of Watson's claims, as a sanction for his malicious fabrication of those claims (*id.* at 15–22).  Defendants argue they are entitled to summary judgment on all of Watson's claims, because he cannot establish a constitutional violation against any Defendant, and they are entitled to qualified immunity (*id.* at 22–43). Defendants submitted evidence in support of their arguments (doc. 124, Exhibits).  The undersigned issued an order on April 16, 2014, informing the parties of the importance and ramifications of summary judgment consideration, providing them with information as to the requirements for materials submitted for review pursuant to Rule 56, directing Watson to respond to the motion by a certain date, and advising the parties that the court would take the motion under advisement upon Watson's filing his response (doc. 126).  On September 17, 2014, Watson responded in opposition to Defendants' motion and submitted evidence in support of his position (docs. 155, 159). Defendants' motion is now ripe for review.

## II.   WATSON'S ALLEGATIONS OF DEFENDANTS' SPOLIATION OF EVIDENCE AND FAILURE TO PRODUCE EVIDENCE DURING DISCOVERY

Before addressing the merits of Defendants' motion for summary judgment, the court first turns to Watson's contention that Defendants' motion should be denied as a sanction for spoliation

---

[1]  The page numbers in this Report and Recommendation are the numbers assigned by the court's electronic docketing system, rather than the page numbers or exhibit references the parties may have designated.

of evidence and failure to produce evidence during discovery (doc. 155, Declaration of Tyson N. Watson ¶¶ 227–44). Watson alleges Lieutenant Edelen destroyed the handheld video camera recordings filmed by Officer Jacobus on March 1, 2012, and Officer Burt on March 4, 2012 (Watson Decl. ¶¶ 227–41, *see also* doc. 155 at 82–88). He contends the alleged spoliation entitles him to an "adverse inference" at the summary judgment stage and an "adverse inference" jury instruction at trial (*id.*). Watson also asserts Defendants objected to certain discovery requests, specifically, requests for production of inmate grievances concerning his medical and mental health treatment, his entire medical record, and documents showing "bed assignments" of inmates (Watson Decl. ¶¶ 242–44).

Watson has not shown he is entitled to sanctions for Defendants' alleged discovery violations. If Watson believed that Defendants' objections to his discovery requests violated the discovery rules, he could have and should have filed a motion to compel or for sanctions under Rule 37 of the Federal Rules of Civil Procedure. Watson obviously knew of the availability of this procedural mechanism because he used it during this litigation (*see* docs. 102, 137). Further, Watson has not made any showing that Defendants' discovery objections were not well-founded or that he was otherwise entitled to an order compelling production. Moreover, the summary judgment record demonstrates Watson has submitted copies of numerous inmate grievances, medical records, and inmate declarations, and he has not shown that Defendants' alleged failures to produce additional grievances, medical records, and documents showing inmate bed assignments would have meaningfully assisted him in responding to Defendants' summary judgment motion.[2] Therefore, Watson failed to demonstrate he is entitled to sanctions for Defendants' alleged discovery violations.

The court next addresses Watson's spoliation claim. "[S]poliation is defined as the destruction of evidence or the significant and meaningful alteration of a document or instrument." Green Leaf Nursery v. E.I. DuPont De Nemours and Co., 341 F.3d 1292, 1308 (11th Cir. 2003). The doctrine of spoliation permits the trier of fact to draw an inference that, if evidence was destroyed in bad faith, the evidence would have ben unfavorable to the party responsible for its

---

[2] As the parties were advised in the Case Management and Scheduling Order, a second, brief discovery period will be provided for trial preparation for any claims that survive summary judgment (*see* doc. 61 ¶ (1)).

destruction.  *See* Aramburu v. Boeing Co., 112 F.3d 1398, 1407 (10th Cir. 1997); Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 334 (3d Cir. 1995); Coates v. Johnson & Johnson, 756 F. 2d 524, 551 (7th Cir. 1985).  At the summary judgment stage, the spoliation doctrine provides a basis for denying a motion for summary judgment where there is sufficient probative evidence for a jury to find an act of spoliation and to draw the inference derived from such an act.  A factual finding of spoliation is necessary only where the court seeks to impose a particular sanction beyond submitting the issue to the jury.  Upon a finding of spoliation, the court may impose the sanction of a jury instruction on spoliation, which instructs the jury that it may infer that the destroyed evidence would have been unfavorable to the party responsible for the destruction.  *See* Flury v. Daimler Chrysler Corp., 427 F.3d 939, 945 (11th Cir. 2005); *see also* Med. Lab. Mgmt. Consultants v. Am. Broad. Co., Inc., 306 F.3d 806, 824 (9th Cir. 2002) (citations omitted).

For a spoliation sanction to apply, it is essential that the evidence in question be within the party's control, that is, the party actually destroyed or was privy to the destruction of the evidence.  *See* Brewer, 72 F.3d at 334.  Further, the party having control over the evidence must have an obligation to preserve it at the time it was destroyed, and generally be on notice of a claim or potential claim at the time of the destruction.  *See* Jandreau v. Nicholson, 492 F.3d 1372, 1375 (Fed. Cir. 2007).  No unfavorable inference arises when the circumstances indicate that the evidence in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for, such as where the destruction was a matter of routine.  *See* Gumbs v. Int'l Harvester, Inc., 718 F.2d 88, 96 (3d Cir. 1983); *see also* 31A C.J.S. Evidence § 251; 29 Am. Jur. 2d Evidence §  256.

"[A] party moving for sanctions must establish, among other things, that the destroyed evidence was relevant to a claim or defense such that the destruction of that evidence resulted in prejudice."  Eli Lilly and Co. v. Air Exp. Intern. USA, Inc., 615 F.3d 1305, 1318 (11th Cir. 2010) (citing Flury, 427 F.3d at 943).  In the Eleventh Circuit, courts consider five factors in determining whether spoliation sanctions are warranted:

> (1) whether the [party seeking sanctions] was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) the practical importance

of the evidence; (4) whether the [spoliating party] acted in good or bad faith; and (5)
the potential for abuse [if a sanction is not imposed] . . . .

Flury, 427 F.3d at 945; *see also, e.g.,* Graff v. Baja Marine Corp., 310 F. App'x 298, 301 (11th Cir. 2009) (unpublished) ("To determine whether spoliation sanctions are warranted, a court must consider the factors identified in Flury . . . ."). The Eleventh Circuit cases applying the Flury factors illustrate that the first three elements (the importance of the evidence, the degree of prejudice to the other party, and whether the prejudice can be cured) are of critical importance, and "bad faith" depends in large part upon the importance of the evidence to a fair trial and the extent to which the spoliating party had notice of that importance and of the need to preserve the evidence. *See* Flury, 427 F.3d at 946; Bashir v. Amtrak, 119 F.3d 929, 932 (11th Cir. 1997) (per curiam); Graff, 310 F. App'x at 301–02. In the Eleventh Circuit, "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." Bashir, 119 F.3d at 931. While this Circuit does not require a showing of malice in order to find bad faith, mere negligence in losing or destroying records is not sufficient to draw an adverse inference. *See* Mann v. Taser Intern., Inc., 588 F.3d 1291, 1310 (11th Cir. 2009) (citing Bashir, 119 F.3d at 931).

In support of Watson's spoliation claim, he submitted a declaration of Inmate Eric Evans, dated March 8, 2012, stating that on March 1, 2012, Evans heard Lieutenant Edelen tell another officer that he intended to destroy the camcorder tapes because "We are gonna get the doctor to take him [Watson] off SHOS [Self-Harm Observation Status] later today and he won't have the tape to prove he really went crazy" (doc. 159, Ex. B, Declaration of Eric Evans ¶ 5). Evans also states that on March 4, 2012, he heard Edelen tell Officer Burt (the handheld camera operator) that he (Burt) should not include the disc from the video camera in the use of force paperwork and instead should give it to him (Edelen) (Evans Decl. ¶ 21). Inmate Evans states Edelen further told Officer Burt that Watson was known to file grievances and lawsuits, and that he (Edelen) was going to destroy the camcorder disc to prevent Watson from relying on it to prove that he had metal in his stomach and was injured when the officers came to "get him" (*id.*). In another declaration dated July 15, 2012, Inmate Evans states that on that day, he saw SLPN Hawkins stop at Watson's cell and heard him tell Watson that he did not care if Watson sued him because "Without any camcorder tapes and with all my notes on your file fabricated to reflect you have no injuries then you have no evidence to base

your lawsuit on" (doc. 159, Ex. I, Declaration of Eric Evans ¶¶ 2–3).  Watson also submitted a declaration of Inmate Willie Davis, dated July 17, 2012, stating that on July 15, 2012, he heard SLPN Hawkins tell Watson that he "destroyed a video in March of Watson with something stuck in his stomach" (doc. 159, Ex. J, Declaration of Willie Davis ¶¶ 2–3).

Watson also submitted a copy of a formal grievance he filed with the SRCI warden on March 26, 2012, appealing a disciplinary report issued against him involving the use of force of March 4, 2012, and he also referenced the use of force on March 1, 2012 (Watson Declaration ¶ 227; doc. 159, Ex. R-6).  On the last page of the ten-page grievance, Watson requested that video evidence be preserved "for duration of statutory limits for filing a civil complaint, which I undoubtably will be filing against Lt. Edlin [sic], Sgt Rogers [sic], Offcs. Johnson and John Doe, and Nurse Hawkins . . . ." (id.).  The grievance was denied on April 3, 2012, by "C. Bishop," the employee responding to the grievance, and "R. Tifft," the warden (id.).

Additionally, Watson submitted copies of the Incident Reports from the uses of force on March 1 and March 4 (doc. 159, Exs. A-7, R-1).  Each Incident Report, which Lieutenant Edelen read and signed as the Shift Supervisor, documents the existence of a handheld video recording (id.).  The Incident Reports document that Officer Jacobus was the camera operator on March 1, and Officer Burt was the camera operator on March 4, and that each operator completed a DC1-801 Chain of Custody form for the handheld videotape and submitted the form and the digital video disc with the use of force documentation (id.).[3]  The Reports of Use of Force Used regarding the March 1 and March 4 incidents indicate that the handheld video recordings, fixed wing video recordings, and all documents pertaining to the uses of force were submitted with the Reports of Use of Force, and the Warden reviewed the videos from both the handheld and fixed wing video cameras, as well as documents attached to the Reports on March 2 and March 5, respectively (doc. 124-23; doc. 124-

---

[3] Officer Robert Olson was responsible for retrieving the fixed wing videos and maintaining them in a format that could be submitted with the use of force documentation (see doc. 124-8, Declaration of Robert Olson).  On March 3, 2012, Officer Olson retrieved digital video from the fixed wing cameras of the events surrounding the use of force on March 1, 2012 (Olson Decl. ¶ 2; see also doc. 159, Ex. R-3).  Olson burned the video onto a CD for the warden's review (Olson Decl. ¶ 2).  After the warden reviewed the CD, Olson uploaded the digital video from the CD onto a secured hard drive, which is backed up by the institution's server (id.).  On March 6, 2012, Officer Olson completed the same process for the digital video from the fixed wing cameras of the events surrounding the use of force on March 4, 2012 (Olson Dec. ¶ 3; see also doc. 159, Ex. R-5).

17; doc. 159, Ex. K-1). The Reports and attachments were submitted to the Use of Force Unit of the Inspector General's Office for review, and the Inspector General's Office approved them on April 6 and April 10, 2012, respectively (*id.*).

Watson also submitted an e-mail chain between Defendants' counsel (specifically, counsel's paralegal) and two members of the SRCI staff, beginning August 27, 2013, and ending November 26, 2013, regarding the existence and location of fixed wing and handheld videos of the March 1 and March 4 incidents (doc. 159, Ex. R-7). The e-mails reflect that on August 27, 2013, Defendants' counsel communicated to Officer Robert Olsen, a Use of Force Analyst, that counsel was representing the Defendants in this case, and that due to FDOC retention schedules, no videos were available from the FDOC's Central Office regarding the incidents (*id.*). Defendants' counsel asked Officer Olson to determine whether SRCI may have stored any videos (*id.*). On the next day, August 28, 2013, Officer Olson downloaded the video clips from the fixed wing videos from the institution's secured hard drive to two CD's and mailed the CD's to counsel (*id.*; *see also* doc. 124-8, Declaration of Robert Olson). On November 26, 2013, after Watson had sent Defendants a request for production of documents dated September 26, 2013, which included a request for any and all videotaped footage from the portable handheld camcorders of him on March 1, 2012, and March 4, 2012 (*see* doc. 159, Ex. U), Defendants' counsel e-mailed Colonel John Kolodziej, stating that the Inspector General's Office "disposed" of all videos in compliance with the retention policy effective at the time of the approved uses of force (as discussed *infra*, the uses of force were approved by the Inspector General's Office in April of 2012). Counsel acknowledged that Officer Olsen had provided copies of the fixed wing videos, but asked that Kolodziej determine whether a "disposition form" was completed documenting the destruction of the handheld videos and, if not, to confirm that the videos were in fact destroyed (*id.*). Colonel Kolodziej responded the same day that SRCI currently did not have any handheld video files on retention, and that as of May 2012, the files were required to be retained by the Inspector General's Office (*id.*). Colonel Kolodziej further responded that he verified that the videos were not at SRCI (*id.*). Kolodziej stated that if the videos were returned to SRCI from the Inspector General's Office following that office's approval of the uses of force, SRCI would have retained them for ninety days and then destroyed them. He further

stated that FDOC policy did not require the institution to complete disposition documentation for videos that were destroyed after the retention period had expired (*id.*).  Defendants' counsel then responded to Watson's discovery request, stating that any handheld video footage was destroyed pursuant to the applicable FDOC retention policy (doc. 159, Ex. U at 4).

Defendants submitted evidentiary material in response to Watson's spoliation claim (doc. 164, Exhibits).  They submitted a declaration of Dean Glisson, a Senior Law Enforcement Inspector in the Office of Inspector General ("OIG") explaining the policies and procedures regarding uses of force and processing and retention of handheld video footage of use of force in effect in March of 2012, when the uses of force occurred in the instant case (doc. 164-3, Declaration of Dean Glisson ¶¶ 2, 3).  Senior Inspector Glisson attached copies of the relevant policies, Florida Administrative Code Rule 33-602.210 and FDOC Procedure 602.004, to his declaration (*see id.*, Exs. 1, 2).[4]  Glisson explains the relevant policies and procedures, and his explanations are supported by the plain language of those policies and procedures.

Per FDOC Procedure 602.004(3), the complete use of force package will be forwarded to the Use of Force Unit in the Office of the Inspector General, including the Use of Force Checklist and all items specified therein (Glisson Decl., Ex. 2).  The OIG will retain any video recording associated with incidents that are disapproved or referred for investigations (*id.*).  Video recordings returned to the Warden will be retained by the Chief of Security for 90 days from the date the tape was received from the OIG (*id.*).  If the 90-day retention period has expired and the video has no further value in retention or is not part of an OIG investigation, the video will be erased (*id.*).

The March 1, 2012, use of force involving Watson was approved by the OIG on April 6, 2012 (Glisson Decl. ¶ 5).  The March 4, 2012, use of force involving Watson was approved by the

---

[4] Watson submitted a copy of FDOC Procedure 602.033, titled Video Cameras/Segregation Housing Unit Fixed Camera Videotape and Digital Video Maintenance and Retention (doc. 159, Ex. R-4).  However, that policy expressly states it applies to videotapes and digital recordings produced by recording equipment from fixed security cameras (*id.*, Purpose). The FDOC's practice and policy regarding the processing and retention of use of force footage from handheld video cameras during the relevant time period is FDOC Procedure 602.004 (*see* Glisson Decl. ¶ 3). Further, the effective date of the policy submitted by Watson is August 23, 2013, but there is no evidence that the videotapes, which were created in March of 2012, existed at the time the policy became effective.

OIG on April 10, 2012 (*id.*).  Neither use of force was referred for investigation (*id.*).[5]  Pursuant to the FDOC's retention schedule, the handheld videos associated with these uses of force would have been destroyed approximately 90 days later, depending upon when they were physically received by the institution, unless they were part of an OIG investigation (Glisson Decl. ¶ 5; *see also* Ex. 2, Procedure 602.004(3)(h)).

In May of 2012, attorneys from the Florida Office of the Attorney General met with FDOC officials to discuss the retention of videotapes from use of force incidents (Glisson Decl. ¶ 6).  The decision was made at this meeting that the OIG's Use of Force Unit would retain all use of force videos regardless of whether the use of force was referred for investigation or disapproved (*id.*). Although the FDOC did not issue a formal directive or memorandum regarding the newly agreed-upon video retention policy in May of 2012, the FDOC began retaining all use of force videos in the OIG's Use of Force Unit at that time (*id.*).  The FDOC later incorporated the new video retention policy into the December 16, 2012, version of Rule 33-602.210 (Glisson Decl. ¶ 7).  Under that version of the Rule, specifically subpart (ll)(h), the following language was added:  "AU video recordings submitted with use of force reports shall be retained and maintained by the OIG in accordance with records retention statutes." (*id.*).  Had Watson's use of force incidents on March 1, 2012, and March 4,2012, been submitted to the OIG after the FDOC's May 2012 meeting with attorneys from the Office of the Attorney General, the videos would have been retained by the OIG (Glisson Decl. ¶ 8).

When an incident report regarding a use of force is created, the incident report and any associated video are reviewed by the Shift Supervisor, the Correctional Officer Chief, and the Warden (Glisson Decl. ¶ 10).  Each person signs the incident report indicating that they have performed the review and writes any comments they have in the space provided (*id.*).  In March and

---

[5] The fact that the OIG approved the uses of force without further investigation distinguishes Watson's circumstances from the circumstances of fellow inmate Warren Smith (DC# T20346), who was the subject of a use of force on February 29, 2012, and handheld videos were submitted as evidence in Smith's § 1983 case.  *See* Smith v. Tifft, Case No. 3:12cv172/RV/CJK, Motion to Seal (N.D. Fla. Feb. 17, 2014), Motion for Summary Judgment (N.D. Fla. Feb. 18, 2014).  The handheld video of the use of force involving Inmate Smith on February 29, 2012, was retained by the OIG's Use of Force Unit because that use of force was referred for investigation (Glisson Decl. ¶ 9).  Because an investigation was opened, the handheld video was retained even though the use of force was ultimately approved (*id.*). In Watson's case, the OIG approved the use of force without opening an investigation.

April of 2012, the Report of Force Used contained a checklist of items that are required to be included in the use of force report (Glisson Decl. ¶ 11; *see also* docs. 164-5, 164-7). The Warden and the Institutional Inspector were both required to review this checklist (form DCI-813) to verify the presence or absence of the documentation listed (*id.*). Their signatures verified that the form correctly reflects whether the listed documentation was included with the use of force report (*id.*). During that time the Report of Force Used, including all documentation and video referenced on the Use of Force Checklist, had to be reviewed by the Warden (Glisson Decl. ¶ 12). The Warden's signature verifies that he has reviewed all of the documentation and that the use of force appears to comply with Florida Administrative Code Rule 33-602.210 (Glisson Decl. ¶ 12; *see also* docs. 164-5, 164-7). During that time the Report of Force Used, including all documentation referenced on the Use of Force Checklist, also had to be reviewed by the Institutional Inspector (Glisson Decl. ¶ 13). The Institutional Inspector's signature verifies that he has reviewed all of the documentation and all required documentation appears to be complete (Glisson Decl. ¶ 13; *see also* docs. 164-5, 164-7).

During that time the Report of Force Used, including all documentation and video referenced on the Use of Force Checklist, had to be reviewed by an Inspector from the OIG's Use of Force Unit before the use of force can be approved or disapproved (Glisson Decl. ¶ 14). The Use of Force Unit Inspector's signature verifies that he/she has reviewed all of the documentation and based upon that review the use of force is either approved or disapproved (*id.*). If video referenced in the Report of Force Used or listed on the Use of Force Checklist is not included when the Report of Force Used is received by the Use of Force Unit, the institution will be contacted and asked to provide the video (Glisson Decl. ¶ 15). In the event that the video is not available at the institution, the institution will be asked to provide a memorandum or an e-mail explaining the absence of the video (*id.*). A copy of the memorandum or e-mail will be included as a part of the Report of Force Used (*id.*). Depending upon the response from the institution an investigation may be initiated (*id.*). If the video included with the Report of Force Used does not match up with videotaping of the incident as described in the Report of Force Used, the Inspector in the Use of Force Unit will contact the institution and ask to be provided with the correct video (Glisson Decl. ¶ 16). In the event that the

correct video is not available at the institution, the institution will be asked to provide a memorandum or an e-mail explaining the absence of the correct video (*id.*). A copy of the memorandum or e-mail will be included as a part of the Report of Force Used (*id.*). Depending upon the response from the institution an investigation may be initiated (*id.*). The absence of any memoranda or e-mails indicates that the correct videos from these uses of force were received by the OIG's Use of Force Unit (Glisson Decl. ¶ 17).

Defendants also submitted a declaration from Defendant Edelen (doc. 164-4, Declaration of Christopher Edelen). With regard to the handheld videos from March 1, 2012, Edelen states that because there was no force used in removing Watson from his cell after he had barricaded himself in, the videotape was not burned onto a disc or submitted for review (Edelen Decl. ¶ 2). Regarding the spontaneous use of force during Watson's escort to the infirmary to be evaluated by mental health personnel, Edelen states after the use of force, Officer Jeffrey Jacobus arrived with a handheld video camera (*id.*, ¶ 3). Edelen states Officer Jacobus initiated videotaping procedures and videotaping continued until Watson was secured in a cell (*id.*). Edelen states the video was burned onto a disc and the disc was included with the use of force report (*id.*, ¶ 4). Edelen states he placed the disc and the use of force paperwork into the security hallway lockbox, and he never saw the disc again (*id.*, ¶ 4).

With regard to the handheld video from March 4, 2012, Defendant Edelen states Officer Joshua Burt retrieved a handheld video camera and began videotaping at approximately noon, in response to a report of Watson creating a disturbance (Edelen Decl. ¶ 5). Edelen states Watson declared a psychological emergency and subsequently ceased his disruptive behavior, so video recording ceased (*id.*). Edelen states Office Burt resumed videotaping approximately 90 minutes later, after chemical agents had been administered (*id.*, ¶ 6).[6] Videotaping continued while Watson was removed from his cell, escorted to the shower, escorted to the medical triage room, and returned to his cell (*id.*). Edelen states he downloaded the video from the handheld video camera onto a disc

---

[6] Pursuant to F.A.C. r. 33-602.210(5)(b)2., if, during the same shift, an inmate ceases the conduct creating the disturbance while the supervisor, camera and camera operator are present, but resumes such conduct after the supervisor, camera and camera operator have left the area, videotaping of the actual application of chemical agents is not required (*see* Glisson Decl., Ex. 1).

and placed the disc and the use of force paperwork into the security hallway evidence locker (*id.*, ¶ 7).  Edelen states he never saw the disc again (*id.*).

Edelen states once he submitted the handheld videos from both March 1, 2012, and March 4, 2012, to the hallway security evidence locker, he never saw them again (Edelen Decl. ¶ 12).  He states he had no responsibility for maintenance or retention of those handheld videos beyond placing them in the evidence locker (*id.*).  Edelen states he played no role in any decision to retain or destroy the handheld videos (*id.*).  He states Procedure 602.004(3)(e) indicates that use of force video recordings returned from the OIG's Office will be returned to the Warden or the Chief of Security for 90 days from the date of receipt (*id.*).  He states he has never been the Warden or the Chief of Security at Santa Rosa C.I.  (*id.*).  Edelen states he does not know what became of the handheld videos once they left his possession (*id.*).

Edelen adamantly denies he ever ordered Officer Burt to give him the disc of the handheld video recording from the March 4, 2012, use of force (Edelen Decl. ¶ 8).  In fact, he states, no disc existed until he burned the disc himself (*id.*).  Edelen also adamantly denies he ever ordered Officer Burt not to include the disc with the use of force paperwork, and he states he was the person who burned the video onto a disc and submitted the disc with the use of force paperwork (*id.*, ¶ 9).

Defendants also submitted the use of force paperwork for March 1 and 4, 2012, and the chain of custody forms for the related videotapes (docs. 164-5, 164-6, 164-7, 164-8).  The chain of custody form for the handheld video of the March 1 use of force indicates Major Kolodziej retrieved the videotape from the security hallway lockbox at 3:00 p.m. on March 1, 2012 (*see* doc. 164-6).  Major Kolodziej signed the use of force paperwork on March 2, 2012, indicating he reviewed the use of force evidence, completed required reports, and determined that the use of force appeared to comply with FDOC policies (*see* doc. 164-5).  Major Kolodziej provided the handheld videotape to Officer Robert Olson (the Use of Force Analyst) at 7:00 a.m. on March 2, 2012 (*see* doc. 164-6).  On March 2, 2012, the Warden signed the use of force paperwork regarding the March 1 incident, indicating he reviewed the handheld video recording and all relevant documents and determined that the use of force appeared to comply with FDOC policies (*see* doc. 164-5).  The Institutional Inspector reviewed the use of force file on April 3, 2012, and indicated that all of the documentation appeared

to be complete (*see id.*, Checklist).  The Use of Force Checklist for the March 1, 2012, incident indicates the chain of custody form for the video and the video itself were part of the use of force paperwork sent to the OIG (*see* doc. 164-5; doc. 164-6).  The OIG approved the use of force on April 6, 2012 (doc. 164-5).

The chain of custody form for the handheld video of the March 4 use of force indicates Major Kolodziej retrieved the videotape from the security hallway lockbox at 3:00 p.m. on March 4, 2012 (*see* doc. 164-8).  Major Kolodziej signed the use of force paperwork on March 5, 2012, indicating he reviewed the use of force evidence, completed required reports, and determined that the use of force appeared to comply with FDOC policies (*see* doc. 164-7).  Major Kolodziej provided the handheld videotape to Officer Robert Olson (the Use of Force Analyst) at 4:00 p.m. on March 5, 2012 (*see* doc. 164-8).  On March 5, 2012, the Warden signed the use of force paperwork regarding the March 4 incident, indicating he reviewed the handheld video recording and all relevant documents (*see* doc. 164-7).  The Report was signed by the Institutional Inspector on April 4, 2012, indicating he reviewed the Report and all attachments, and all of the documentation appeared to be complete (*id.*).  The Use of Force Checklist for the March 4, 2012, use of force indicates the Chain of Custody form for the video and the video itself was part of the Use of Force Paperwork sent to the OIG (*see* doc. 164-7; doc. 164-8).   The OIG approved the use of force on April 10, 2012 (doc. 164-7).

Watson has not shown that the first three Flury factors (the importance of the evidence, the degree of prejudice to him, and whether the prejudice can be cured) weigh in his favor.  Viewing the evidentiary material in the light most favorable to Watson, he does not allege that the handheld videos show something that is not evidenced by another evidentiary source, for example, Watson's own extremely detailed description of the relevant events, the accounts of other inmate witnesses, and Watson's medical records, to name a few.  Therefore, he has not shown that the handheld videos were important, that their destruction prejudiced him, or that any prejudice cannot be cured.

Watson has also failed to satisfy the fourth Flury factor, that the spoliating party acted in bad faith.  Although it is undisputed that the videos from the handheld cameras were destroyed, Watson's evidence fails to show that any named Defendant actually destroyed either of them or was

privy to the destruction.  While Watson submitted evidence that Lieutenant Edelen verbalized an intent to exclude the videos from the use of force documentation and destroy them, there is no evidence he actually did so.  Indeed, the evidence refutes Watson's assertions, because it shows that the handheld videos were included in the use of force reports that were sent to and reviewed by the OIG.  Further, the handheld videos were destroyed pursuant to FDOC policies and procedures in effect at that time, and Watson has not shown that at the time they were destroyed, the custodian of the videos (*i.e.*, the Chief of Security per FDOC Procedure 602.004(3)(e)) had an obligation to preserve them or was on  notice of a need to preserve them beyond the 90-day retention period.[7]

    Watson has not shown that the <u>Flury</u> factors weigh in favor of imposition of sanctions. Therefore, his request for an "adverse inference" is denied.

III.    MATERIAL FACTS FOR PURPOSES OF SUMMARY JUDGMENT

    As this case comes before the court on Defendants' motion for summary judgment, the court views the facts in the light most favorable to Watson, the non-moving party, *see* <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993), drawing those facts from the pleadings, depositions, and other evidentiary materials on file.  Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts.  *See* <u>Montount v. Carr</u>, 114 F.3d 181, 182 (11th Cir. 1997).

    With regard to the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

    **(1) Supporting Factual Positions.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

---

[7] As previously noted, Plaintiff filed a formal grievance filed with the Warden on March 26, 2012, appealing a disciplinary report issued against him involving the use of force of March 4, 2012, and he referenced the use of force on March 1, 2012 (Watson Declaration ¶ 227; doc. 159, Ex. R-6).  On the last page of the ten-page grievance, Watson requested that video evidence be preserved "for duration of statutory limits for filing a civil complaint, which I undoubtably will be filing against Lt. Edlin [sic], Sgt Rogers [sic], Offcs. Johnson and John Doe, and Nurse Hawkins . . . ." (*id.*).  The grievance was denied on April 3, 2012, by "C. Bishop," the employee responding to the grievance, and the Warden (*id.*).  At the time the grievance was denied, the videos were in the custody of the OIG.  There is no evidence that upon the OIG's approving the uses of force and returning the videos to the institution, the Chief of Security was on notice of the need to preserve the videos beyond the 90-day retention period.

> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> . . . .
>
> **(4) Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010). Facts asserted in hearsay statements which are not subject to a hearsay exception, and thus would not be admissible in evidence, are insufficient to show that a fact is genuinely disputed.

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment, or grant summary judgment if Defendants' motion and supporting materials—including the facts considered undisputed—show that Defendants are entitled to it. *See* Fed. R. Civ. P. 56(e)(2, 3) (2010).

Any facts included in Defendants' statement of material facts that are not controverted in Watson's response are deemed admitted. *See* N.D. Fla. Loc. R. 56.1(A) (all material facts set forth in moving party's statement of undisputed material facts will be deemed admitted unless controverted by the statement required to be filed and served by opposing party). Additionally, the court notes that some the events at issue were captured by fixed wing video cameras. The digital videos from the fixed wing cameras are part of the record (doc. 125, Exs. M, N).[8] The facts presented here are viewed in the light depicted by the videos to the extent those facts are captured

---

[8] The court granted Defendants' unopposed motion to file the digital videos under seal (docs. 125, 126).

on camera.[9]  *See* <u>Scott v. Harris</u>, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007)

(stating that when a videotape of an incident is part of the record, the court should view the facts in

the light depicted by the videotape).  Applying these standards, the court conveys the following as

the material facts.[10]

      On March 1, 2012, at approximately 7:11 a.m., Lieutenant Edelen, who was assigned to C-

dormitory, entered wing two of C-dormitory in response to a report that Watson had covered his cell

window and was kicking his cell door and yelling onto the wing (Defendants' Statement of Material

and Genuine Facts ¶ 1; doc. 124-2, Declaration of Christopher Edelen ¶ 2; doc. 164-4, Declaration

of Christopher Edelen ¶ 2; doc. 125, Ex. M1, Fixed Wing Video at 07:11:19).   Edelen ordered

Watson to cease his disruptive behavior, but Watson refused (Defendants' Statement of Material and

Genuine Facts ¶ 1; Edelen Decl. ¶ 2).  Edelen exited the wing at 7:12 (Defendants' Statement of

Material and Genuine Facts ¶ 1; Edelen Decl. ¶ 2; Fixed Wing Video at 07:12:34).  Edelen initiated

videotaping procedures for a possible use of force, and at 7:19 a.m., he and other officers, one of

whom operated a handheld video camera, entered the wing (Defendants' Statement of Material and

Genuine Facts ¶ 1; Edelen Decl. ¶ 2; Ex. M1, Fixed Wing Video at 07:19:32).  After officers arrived

at Watson's cell, Watson declared a psychological emergency and made threats and gestures of self

harm (Defendants' Statement of Material and Genuine Facts ¶ 1; Edelen Decl. ¶ 2).  Watson states

earlier that morning he had attempted to cut his arms and head, but his efforts were unsuccessful

because he was using a "very dull" razor blade (Second Amended Complaint at 11, 14; Watson

Decl. ¶ 8).[11]  He admits he had covered his cell window so that officers were unable to see whether

---

   [9] The fixed wing videos do not include audio and thus do not provide evidentiary support for any facts other than those that are visibly observable.

   [10] The court has slightly supplemented Defendants' statement of the undisputed facts with some additional information taken from the cited sources.

   [11] Watson signed his Second Amended Complaint under penalty of perjury.  Therefore, the factual allegations in the complaint may be used as an opposing affidavit.  *See* <u>Perry v. Thompson</u>, 786 F.2d 1093, 1095 (11th Cir. 1986); <u>Sammons v. Taylor</u>, 967 F.2d 1533, 1545 n.5 (11th Cir. 1992) ("[F]acts alleged in an inmate's sworn pleading are sufficient and . . . a separate affidavit is not necessary."); *see also* 28 U.S.C. § 1746 (setting forth requirements for unsworn declarations under penalty of perjury).  To function as an opposing affidavit, a complaint must be based on personal knowledge and set forth specific facts admissible in evidence. Fed. R. Civ. P. 56(c); <u>Perry</u>, *supra*.  Accordingly, the court considers those portions of Watson's complaint that meet the personal knowledge and specificity requirements

he was all right, and he admits he refused an order to remove the covering (doc. 164-4, Watson Dep. 30:3–18, 43:22–24).  Mental Health Specialist Lena Lyons was notified of the situation (Defendants' Statement of Material and Genuine Facts ¶ 1; Edelen Decl. ¶ 2).  Edelen issued several verbal orders to Watson to cease his disruptive behavior and submit to hand restraints (*id.*).  Upon hearing Ms. Lyons's voice, Watson complied with Edelen's order and submitted to restraints, and video recording ceased (Watson Dep. 30:9–18, 43:9–24; Defendants' Statement of Material and Genuine Facts ¶ 1; Edelen Decl. ¶ 2).  When officers, including Defendant Johnson, attempted to open the door of Watson's cell, it would not move because Watson had used his state-owned and personal property to barricade his cell door (Defendants' Statement of Material and Genuine Facts ¶ 2; Edelen Decl. ¶ 3; doc. 124-3, Declaration of Robert Johnson ¶ 3).  Defendant Edelen instructed Officer John Gaynor to retrieve the cell-breaching tool, so that Watson could be removed from his cell (Defendants' Statement of Material and Genuine Facts ¶ 2; Edelen Decl. ¶ 3).  Mental Health Specialist Lyons arrived on the wing at approximately 7:37 a.m., proceeded to Watson's cell, and attempted to reassure Watson that he was safe and should allow her to counsel him and medical staff to treat his wounds (Second Amended Complaint at 14, ¶ 10; Ex. M1, Fixed Wing Video at 07:37:12).  Lyons remained in the wing until 7:43 a.m., when officers successfully removed Watson from his cell and escorted him to the mental health group room, where Lyons initially evaluated him (Second Amended Complaint at 14, ¶ 22; Defendants' Statement of Material and Genuine Facts ¶ 2; Edelen Decl. ¶ 3; Johnson Decl. ¶ 3; Exs. M1–M2, Fixed Wing Video at 07:37:12–07:44:29).

At 7:47 a.m., Watson was removed from the mental health group room and escorted to a secure shower cell (Defendants' Statement of Material and Genuine Facts ¶ 2; Edelen Decl. ¶ 3; Johnson Decl. ¶ 3; Ex. M1, Fixed Wing Video M1 at 07:43:16–07:43:47, Ex. M3, Fixed Wing Video).  At 7:52 a.m., Watson was removed from the shower cell and escorted to the medical triage room for treatment (Defendants' Statement of Material and Genuine Facts ¶ 3; Edelen Decl. ¶ 3; Johnson Decl. ¶ 3; Ex. M4, Fixed Wing Video at 07:52:07–07:52:20).  SLPN Hawkins examined

---

as part of Watson's opposition to the motion for summary judgment.  *See* Moulds v. Bullard, 345 F. App'x 387, 391 (11th Cir. 2009) ("[S]pecific facts pled in a sworn complaint must be considered in opposition to summary judgment.") (citing Perry); Shaw v. Cowart, 300 F. App'x 640, 645 (11th Cir. 2008) ("Facts alleged by the plaintiff in a sworn pleading" must be considered in opposition to summary judgment).

Watson and noted self-inflicted superficial lacerations to Watson's bilateral forearms and scratches to his bilateral forehead (Defendants' Statement of Material and Genuine Facts ¶ 3; doc. 124-4, Declaration of Bobby Hawkins ¶ 2, attached Abrasion/Laceration Protocol).  The dimensions of the lacerations were approximately one centimeter long, less than one centimeter wide, and less than one centimeter deep (*id.*).  There was no embedded foreign material in any of the wounds, and there was minimal bleeding (*id.*).  Hawkins cleaned the lacerations and scratches with Betadine solution and dressed them with gauze and tape (*id.*).  Watson was placed on SHOS at approximately 8:11 a.m. (doc. 159, Ex. C-1, Observation Checklist).

Watson states that while he and Defendants Edelen, Hawkins, and Johnson were in the medical triage room, Defendants verbally agreed that Watson should be beaten during his escort to the infirmary and sprayed with chemical agents over the weekend as punishment for the "extra work" he created by injuring himself (Watson Decl. ¶¶ 15, 16, 19; Second Amended Complaint at 14).[12]  Defendants Edelen, Johnson, and Hawkins deny any such statements were made (Edelen Decl. ¶ 4; Johnson Decl. ¶ 4; Hawkins Decl. ¶ 3).

Watson left the medical triage room at approximately 8:15 a.m. (doc. 124-16, Declaration of Jeffrey Quesenberry ¶ 2, incorporated facts from attached Incident Report).  Defendants state while Edelen, Johnson, and Officer Quesenberry were escorting Watson from C-dormitory to the infirmary to be evaluated by mental health personnel, Watson stopped walking (Defendants' Statement of Material and Genuine Facts ¶ 4; Edelen Decl. ¶ 5; Johnson Decl. ¶ 5; Quesenberry Decl. ¶ 2, incorporated facts from attached Incident Report).  Defendants state Watson was given several verbal orders to continue walking to the infirmary (*id.*).  They also state Watson attempted to pull away from the custodial grasp of Johnson and Quesenberry (*id.*).  Defendants state they had to force Watson to the sidewalk in order for Johnson and Quesenberry to regain control of him (*id.*).  Defendants state Watson continued resisting while on the ground, thus requiring them to hold him on the ground until he ceased his combative behavior (*id.*).  Watson states Defendants slammed him onto the concrete sidewalk face first, while Edelen snatched his ankle shackles out from under him (Watson Decl. ¶ 17).  He states even though he screamed for help, the officers then struck his head,

---

[12] The court takes judicial notice that March 1, 2012, was a Thursday.

nose, back, and feet, and twisted his wrists and fingers (*id.*, ¶ 18).  Watson states he was not combative, aggressive, violent, or "physically resistant in any other way to any lawful command" (*id.* ¶ 20).  He states he "did nothing wrong to justify the force used" (*id.* ¶ 21).  During Watson's deposition, he stated he believed that the officers intended to cause him pain but did not intend to leave visible physical injuries such that they would be required to initiate use-of-force reporting procedures (doc. 124-14, Watson Dep. 98:18–99:21).  After the use of force ceased, Officer Jeffrey Jacobus arrived with a handheld video camera from B-dormitory (Edelen Decl. ¶ 5).  Officer Jacobus initiated videotaping procedures, and Edelen gave a brief lead-in statement explaining what had occurred (*id.*).  Edelen ordered Watson to stand up (*id.*).  Officers assisted Watson to his feet and escorted him to the infirmary (*id.*).

Upon Watson's arrival in the infirmary at approximately 8:25 a.m., Watson received a post-use-of-force physical by Registered Nurse Specialist Allen (Defendants' Statement of Material and Genuine Facts ¶ 5; doc. 124-6, Declaration of Doctor Jordan Iserman, attached medical records). At approximately 8:30 a.m., Nurse Allen notified Dr. Iserman, a psychiatrist, that Watson was placed in an Isolation Management Room ("IMR") for monitoring after a self-harm incident that resulted in superficial lacerations (*id.*).  During Nurse Allen's examination, Watson refused to have his vital signs checked (*id.*).  Nurse Allen noted that Watson was verbally combative, ambulatory, oriented to person, place, time, and situation, and responding to questions verbally (*id.*).  Nurse Allen noted only the following injuries: "superficial lacerations to R[ight] A[nte]C[ubital], no active bleeding; wound to L[eft] knee—bloody; nose bleeding" (*id.*).  No other injuries were noted (*id.*). In the section of the medical records marked "Treatment provided," Nurse Allen checked "no" and wrote:  "None needed, no active bleeding on wounds—dried blood" (Defendants' Statement of Material and Genuine Facts ¶ 5; Iserman Decl., attached medical records).  Watson made no complaints of pain to Nurse Allen (*id.*).  Watson admits that the lacerations to his arm were self-inflicted (Watson Decl. ¶ 8).  Watson testified at his deposition that the nurse documented all of his physical injuries (bloody nose and scraped knee) associated with the use of force that day, except for pain and possibly a bruise to his left shoulder (Watson Dep. 124:1–125:23).  During Nurse Allen's examination, Watson alleged that staff attempted to sexually abuse him during the use of

force (Edelen Decl. ¶ 7).  Defendant Edelen contacted the institutional inspector to advise him of the allegation of sexual abuse, and a Prison Rape Elimination Act number was assigned to the incident, separate from the Use of Force reference number assigned to the incident (*id.*).

After the post-use-of-force physical examination, Watson was secured in an IMR under SHOS (Defendants' Statement of Material and Genuine Facts ¶ 6; Iserman Decl. ¶ 2; doc. 159, Ex. C-1).  Lieutenant Edelen gave a closing statement on the video, and recording ceased (Edelen Decl. ¶ 8).  Watson's behavior was observed at fifteen-minute intervals by security or nursing staff during the nearly six-hour period he was on SHOS (doc. 159, Ex. C-1).  According to staff's recorded observations, Watson was mostly lying or sitting, and occasionally standing still while talking to staff (*id.*).  He refused a meal and fluids at approximately 10:00–10:15 a.m. (*id.*).  Dr. Iserman evaluated Watson at approximately 2:10 p.m. (Iserman Decl. ¶ 3).  His professional observations were the following:

> Inmate has recently [complained of] "slowly losing it" since most recently removed from psychotropic medication (Lithium) which <u>he</u> specifically requested then refused on multiple occasions.  Has provided rambling note which suggests psychotic, delusional preoccupation yet previous records of treatment do not document psychotic thought processes, only manipulative behavior designed to obtain [secondary] gain.

> M[entl]S[tatus]E[xam] Inmate has refused to speak [with] this examiner today.  Observed in infirmary over the course of the day and has made no attempt to harm self or act out in dangerous fashion.

> Impression:   Axis I – Mood disorder N[ot]O[therwise]S[pecified]
>                        Axis II – A[nti]S[ocial]P[ersonality]D[isorder]

> Plan:   In light of current presentation, refusal to cooperate and past [history] indicative of repeated attempts to manipulate and failure to comply with treatment interventions, I believe he should be [discharged] to security as I can find no basis or reason in fact to refer for a higher level of psychiatric treatment.

(Defendants' Statement of Material and Genuine Facts ¶ 6; Iserman Decl. ¶ 3, attached medical records).  Dr. Iserman did not receive any input from SLPN Hawkins (*id.*).  All of Dr. Iserman's psychiatric evaluations of Watson on March 1, 2012, were based upon his own professional opinion in light of his objective observations and his review of Watson's medical records (*id.*).  Based upon

this observation, Dr. Iserman released Watson to security in stable condition (*id.*). Watson was last observed in SHOS at 2:15 p.m. (doc. 159, Ex. C-1).[13]

Watson was returned to C-dormitory at approximately 2:20 p.m., and placed on property restrictions due to his using state and personal property to barricade his cell door earlier that morning (Defendants' Statement of Material and Genuine Facts ¶ 7; Edelen Decl. ¶ 9, attached Daily Record of Special Housing).

Continuing to the second use of force at issue in this case, Defendants state that at approximately 11:25 a.m. on March 4, 2012, Defendant Sergeant Rogers was conducting security checks in C-dormitory when he observed Watson yelling obscenities into the wing and kicking on his cell door (Defendants' Statement of Material and Genuine Facts ¶ 8; doc. 124-5, Declaration of Daryle Rogers ¶ 2). Inmates may not yell and disrupt the operations of the dormitory for security and safety reasons (Rogers Decl. ¶ 3; Edelen Dec. ¶ 11). Yelling and kicking on cell doors inhibits the ability of correctional officers to hear what is going on in that wing (*id.*). Officers may not be able to hear calls for assistance from inmates or other correctional officers (*id.*). Officers will also have difficultly communicating with each other if an inmate is yelling into the wing or kicking on his cell door (*id.*). Yelling obscenities into the wing could also initiate a riot on the wing (*id.*). Additionally, yelling into the wing is against the rules of the FDOC, and inmates must follow the rules as part of their rehabilitation process (*id.*).

Defendants state Sergeant Rogers attempted to counsel with Watson and gave Watson several orders to cease his disruptive behavior, but Watson refused all orders and continued to yell obscenities into the wing, kick on his door, and create a disturbance in the housing unit (Defendants' Statement of Material and Genuine Facts ¶ 8; Rogers Decl. ¶ 4). Defendants state that at

---

[13] Watson makes much of the fact that Nurse Allen's notation in Watson's medical records indicated that Watson was released to security with no admission for in-patient treatment at 2:00 p.m. (Watson Decl. ¶ 25; doc. 159, Ex. C-2; *see also* Iserman Decl., attached medical records). Watson states this demonstrates he was released from SHOS prior to Dr. Iserman's evaluation at 2:15 p.m., which Watson suggests supports his theory that Defendants Edelen and Hawkins secured his discharge from SHOS so that Watson would be returned to his cell to be sprayed with chemical agents over the weekend. However, Dr. Iserman's entry in Watson's chronological medical record, which states the time as 2:15 p.m., appears above Nurse Allen's. In Watson's other chronological medical records which are part of the summary judgment record, all of the entries begin at the top of the page and continue down the page in chronological order (*see* doc. 159, Exs. E-5, E-9, Ex. N). Watson's evidence is insufficient to show a genuine issue of material fact as to whether Dr. Iserman evaluated Watson before Watson was discharged from SHOS.

approximately 11:30 a.m., Sergeant Rogers contacted Lieutenant Edelen regarding Watson creating a disturbance on the wing (Defendants' Statement of Material and Genuine Facts ¶ 8; Edelen Decl. ¶ 10; Rogers Decl. ¶ 4).  Defendants state Lieutenant Edelen attempted to counsel with Watson and gave Watson several verbal orders to cease his disruptive behavior, but Watson refused all orders given to him (Defendants' Statement of Material and Genuine Facts ¶ 8; Edelen Decl. ¶ 10).  Edelen then reviewed Watson's DC6-650B form, which indicated that Watson had no known medical conditions that would be exacerbated by the use of chemical agents (Defendants' Statement of Material and Genuine Facts ¶ 8; Edelen Decl. ¶ 12, attached Risk Assessment for the Use of Chemical Restraint Agents and Electronic Immobilization Devices).  SLPN Hawkins advised Edelen that Watson had no known medical conditions that would be exacerbated by the use of chemical agents (Defendants' Statement of Material and Genuine Facts ¶ 8; Edelen Decl. ¶ 12).  Edelen contacted the Duty Warden, Michael Booker, who authorized the use of chemical agent Oleoresin Capsicum ("OC") if necessary to quell the disturbance Watson was creating (Defendants' Statement of Material and Genuine Facts ¶ 8; Edelen Decl. ¶ 12, attached Authorization for Use of Force).

Lieutenant Edelen instructed Officer Joshua Burt to retrieve the C-dormitory handheld digital video camera for a possible chemical agent use of force on Watson (doc. 124-10, Declaration of Joshua Burt ¶¶ 2–3, incorporated facts from attached Incident Report).  Officer Burt began videotaping procedures, and Lieutenant Edelen gave a lead-in statement explaining the efforts made to quell the disturbance with non-force intervention efforts and the failure of those non-force intervention efforts (Defendants' Statement of Material and Genuine Facts ¶ 9; Edelen Decl. ¶ 13; Burt Decl. ¶ 2, incorporated facts from attached Incident Report).  At 12:01 p.m., Lieutenant Edelen, Sergeant Rogers, and Officer Burt approached Watson's cell (Ex. N1, Fixed Wing Video 12:01:34).  Lieutenant Edelen ordered Watson to cease his disruptive behavior (Defendants' Statement of Material and Genuine Facts ¶ 9; Edelen Decl. ¶ 13; Rogers Decl. ¶ 6; Burt Decl. ¶ 2, incorporated facts from attached Incident Report).  At that time, Watson declared a psychological emergency (Defendants' Statement of Material and Genuine Facts ¶ 9; Edelen Decl. ¶ 13; Rogers Decl. ¶ 6).  Watson had engaged in self-injurious behavior by cutting his arms (*id.*).  Lieutenant Edelen ordered Officer Mark Delavega and Sergeant Rogers to put on personal protective equipment in response

to Watson cutting his arms (Defendants' Statement of Material and Genuine Facts ¶ 9; Edelen Decl. ¶ 13).  Edelen observed Watson holding a razor blade and ordered him to flush the razor blade down the toilet, and Watson complied (*id.*).  Lieutenant Edelen advised Watson that this was his final order to cease his disruptive behavior and that chemical agents would be administered if Watson did not cease his disruptive behavior (Defendants' Statement of Material and Genuine Facts ¶ 10; Edelen Decl. ¶ 14).  Edelen advised Watson that this warning would not be repeated prior to the application of chemical agents in the event Watson resumed his disruptive behavior after Edelen and the camera operator (Officer Burt) left the wing (*id.*).  Defendants state Sergeant Rogers ordered Watson to submit to wrist restraints, but Watson refused to comply (Defendants' Statement of Material and Genuine Facts ¶ 10; Rogers Decl. ¶ 7; Delavega Decl. ¶¶ 2, 5, incorporated facts from attached Incident Report).

SLPN Hawkins was notified that Watson was declaring a psychological emergency and threatening acts of self-harm (Hawkins Decl. ¶ 6).  At approximately 12:08 p.m., Hawkins entered the wing to perform a cell-front examination of Watson (Hawkins Decl. ¶ 6; Ex. N1, Fixed Wing Video at 12:08:47).  Defendants states Hawkins advised Watson to submit to wrist restraints so that his wounds could be treated, but Watson refused (Defendants' Statement of Material and Genuine Facts ¶ 10; Hawkins Decl. ¶ 6).  Defendants state Watson subsequently ceased his disruptive behavior, so Lieutenant Edelen gave a brief closing statement, video recording ceased, and Edelen, Hawkins, and Officer Burt left the wing at approximately 12:09 p.m. (Defendants' Statement of Material and Genuine Facts ¶ 10; Edelen Decl. ¶ 14; Rogers Decl. ¶ 7; Burt Decl. ¶ 2, incorporated facts from attached Incident Report; Ex. N1, Fixed Wing Video at 12:09:39).  At approximately 12:23 p.m., Watson submitted to wrist restraints and exited his cell (Ex. N1, Fixed Wing Video at 12:23:48).

Watson tells a very different version of the events that morning.  He states Lieutenant Edelen came to his cell door and told him to get ready to be tortured with chemical agents to deter him and other inmates from "trying to go psych" (Watson Decl. ¶ 58).  Watson states Edelen offered to spray him with chemical agents only once and return Watson's property, bedding, linen, and clothing the next day if Watson agreed not to resist the application of chemical agents by "go[ing] psych" (*id.*

¶ 59).  Watson states at 11:25 a.m., Sergeant Rogers came to his cell door and asked if he still accepted Edelen's offer of returning Watson's property, bedding, linen, and clothing if Watson allowed Edelen to spray him only once without resisting by trying to "go psych" (*id.* ¶ 62).  Watson states he told Rogers yes (*id.*).  Watson states he then attempted to cut his antecubital veins and stabbed two pieces of metal partway into his abdomen to avoid being sprayed with chemical agents (*id.* ¶¶ 64).  Watson states he was not participating in or inciting a disturbance on the wing, and he specifically denies he ever kicked or banged on his cell door at any time (Watson's Statement of Disputed Facts ¶ 82).  He states he was not verbally loud at any time, except for his "self-harm expressions" (*id.*).

Upon Watson's exiting his cell at 12:23 p.m., Sergeant Rogers and Officer Delavega began escorting Watson to the medical triage room; however, during the escort, Watson laid down on the floor (Defendants' Statement of Material and Genuine Facts ¶ 10; Rogers Decl. ¶ 8; Delavega Decl. ¶ 2, incorporated facts from attached Incident Report; Ex. N1, Fixed Wing Video at 12:23:46–12:24:04).  Sergeant Rogers and Officer Delavega state Watson refused to walk (Rogers Decl. ¶ 8; Delavega Decl. ¶ 2, incorporated facts from attached Incident Report).  Watson states he was walking "sluggishly" due to the pain he was experiencing from his self-inflicted wounds (Watson Decl. ¶ 83).  He states he "collapsed" to the floor on his side and saw the metal "rods" still sticking out of his stomach, and he admits he continued to lie on the floor (*id.* ¶¶ 83– 85).  SLPN Hawkins and Lieutenant Edelen returned to the wing at 12:25, and Hawkins advised Watson that he needed to continue walking to medical so he could be medically assessed and treated (Defendants' Statement of Material and Genuine Facts ¶ 10; Edelen Decl. 15; Hawkins Decl. ¶ 6; Ex. N1, Fixed Wing Video at 12:25:11–12:25:32).  Sergeant Rogers and Officer Delavega assisted Watson to his feet and escorted Watson the rest of the way to the medical triage room (Defendants' Statement of Material and Genuine Facts ¶ 10; Rogers Decl. ¶ 8; Delavega Decl. ¶ 2, incorporated facts from attached Incident Report; Hawkins Decl. ¶ 6; Edelen Decl. ¶ 15; Ex. N1, Fixed Wing Video at 12:25:32–12:26:05).  Lieutenant Edelen and Sergeant Rogers state that at no time did they see any metal rods sticking out of Watson's abdomen (Edelen Decl. ¶ 15; Rogers Decl. ¶ 8).  Watson states the metal pieces were visible when he exited his cell (Watson Decl. ¶ 83).  Additionally,

Inmate Eric Evans states he saw a "shinny metal-like object" sticking out of Watson's abdomen before Watson fell on the floor and after he got up (doc. 159, Ex. B, Declaration of Eric Evans ¶12).

Watson arrived at the medical triage room at approximately 12:27 p.m. (Ex. N4, Fixed Wing Video 12:27:36).  Once inside the medical triage room, SLPN Hawkins assessed Watson's injuries.  He noted that Watson had self-inflicted superficial lacerations to his right arm, left arm, and abdomen (Defendants' Statement of Material and Genuine Facts ¶ 11; Hawkins Decl. ¶ 7, attached Abrasion/Laceration Protocol).  SLPN Hawkins noted the approximate size and depth of the lacerations as 2 centimeters in length, less than 1 centimeter in width, and less than 1 centimeter in depth (*id.*).  Hawkins also noted an old abrasion to Watson's left knee (*id.*).  Hawkins did not observe any active bleeding or embedded material in Watson's wounds (*id.*).  Hawkins noted Watson's voiced pain level was a zero on a scale of one to ten (*id.*).  Hawkins cleaned Watson's self-inflicted wounds with Betadine solution and dressed them with gauze and tape (*id.*).  Watson states he still had two pieces of metal sticking out of his stomach when he arrived in the medical triage room (Watson Decl. ¶ 92).  He states after Hawkins cleaned and dressed the wounds to his arms, Hawkins "snatched" one piece of metal out of Watson's abdomen, and then forced the other piece completely into his stomach (*id.*).  In Watson's deposition, he admitted he did not actually see Hawkins do anything with the metal pieces (Watson Dep. 160:2–161:13).  Further, he made vague and somewhat contradictory statements about why he believed that Hawkins had forced one piece of metal into his abdomen and removed the other.  Watson stated he "felt" Hawkins remove one piece of metal (Watson Dep. 161:4); yet he also stated he did not know until "months and months later" that Hawkins had removed one piece of metal (Watson Dep. 159:25–160:3).  Regarding the other piece of metal, Watson stated he "thought"  Hawkins had removed both pieces (Watson Dep. 161:3–5); yet he also stated he "felt it when he [Hawkins] hit it in" (Watson Dep. 160:12–14).  Lieutenant Edelen, Sergeant Rogers, and Officer Delavega state at no time did they see SLPN Hawkins force a metal piece into Watson's abdomen or pull a metal piece out of his abdomen (Edelen Decl. ¶ 16; Rogers Decl. ¶ 9; Delavega Decl. ¶ 3).  Officer Delavega additionally states that if he had seen anyone force a metal rod into Watson's abdomen, he would have reported it and included that fact in his incident report (Delavega Decl. ¶ 3).

Watson was escorted from the medical triage room at approximately 12:40 p.m. (Ex. N4, Fixed Wing Video at 12:40:00).  During the escort back to Watson's cell, Watson stood upright and showed no signs of discomfort, physical distress, or physical limitation (Defendants' Statement of Material and Genuine Facts ¶ 11; Rogers Decl. ¶ 9; Delavega Decl. ¶ 4; Ex. N5, Fixed Wing Video at 12:40:33–12:40:47; Ex. N6, Fixed Wing Video at 12:40:41–12:40:56; Ex. N7, Fixed Wing Video at 12:40:54–12:41:15).  Watson states prior to reaching the door to wing two, Sergeant Rogers told him to "walk normal" or he would slam him on the ground (Watson Decl. ¶ 101).  Watson states he told Rogers he was in pain, but Rogers responded that Watson would suffer more pain if he continued to walk like he was hurt (*id.*).  Watson states he began to walk as upright and "normal" as he could out of fear (*id.*). Watson was secured in his cell at 12:43 p.m. (Defendants' Statement of Material and Genuine Facts ¶ 11; Rogers Decl. ¶ 9; Ex. N7, Fixed Wing Video at 12:43:00).

Defendants state at approximately 1:00 p.m. Watson resumed kicking on his cell door and yelling obscenities into the wing (Defendants' Statement of Material and Genuine Facts ¶ 12; Rogers Decl. ¶ 10).  Watson denies he yelled, screamed, kicked, or banged at any time, and he submitted a declaration from another inmate stating the same (Watson Decl. ¶ 109; Evans Decl. ¶15). Defendants state at approximately 1:01 p.m., Sergeant Rogers counseled with Watson at his cell door to cease his disruptive behavior, but Watson refused to comply (Defendants' Statement of Material and Genuine Facts ¶ 12; Rogers Decl. ¶ 10).  Watson states Rogers told him they were going to heat the cans of chemical agents and spray him until he burned to death (Watson Decl. ¶ 110).  Sergeant Rogers notified Lieutenant Edelen that Watson had resumed his disruptive behavior and refused Rogers's order to cease (Edelen Decl. ¶ 17).  Lieutenant Edelen removed the canister of OC from the secured storage area, weighed the canister, noted the weight in the chemical agent accountability log for that specific OC canister, and signed the log with the time as it appeared on his watch (*id.*, attached Chemical Agent Accountability Log).  At approximately 1:08 p.m., Lieutenant Edelen and Sergeant Rogers entered wing two, and approximately one minute later Sergeant Rogers administered three one-second bursts (totaling 167g) of OC through the handcuffing portal of Watson's cell door (Defendants' Statement of Material and Genuine Facts ¶ 12; Rogers Decl. ¶ 10; Edelen Decl. ¶ 17, attached Chemical Agent Accountability Log; Ex. N7,

Fixed Wing Video at 13:08:55–13:09:35). Watson states he was sitting quietly on the toilet when Edelen and Rogers sprayed him "for no legitimate reason" (Watson Decl. ¶ 111). Edelen returned the OC canister to the secured storage area, weighed the canister, noted the weight in the log, and signed the log with the time as it appeared on his watch (Defendants' Statement of Material and Genuine Facts ¶ 12; Edelen Decl. ¶ 17, attached Chemical Agent Accountability Log).

Defendants state Watson continued to kick on his cell door and yell obscenities into the wing even after the application of chemical agents (Defendants' Statement of Material and Genuine Facts ¶ 12; Edelen Decl. ¶ 17; Rogers Decl. ¶ 10). Watson states he "cried that [he] was burning alive," but at no time did he bang, kick, or yell obscenities (Watson Decl. ¶¶ 113, 117). Lieutenant Edelen returned to the wing at 1:11 p.m., and remained for four minutes (Ex. N7, Fixed Wing Video at 13:11:49–13:15:49). Watson states while Edelen was at his cell front, Edelen told him they would have mercy on him if he sang a song (Watson Decl. ¶¶ 113, 117; Watson Dep. 195:6–7). Watson states he removed his boxer shorts because they were saturated with chemical agents (Watson Decl. ¶ 114). Lieutenant Edelen again removed the same canister of OC from the secured storage area, weighed the canister, noted the weight in the chemical agent accountability log, and signed the log with the time as it appeared on his watch (Defendants' Statement of Material and Genuine Facts ¶ 12; Edelen Decl. ¶ 18, attached Chemical Agent Accountability Log). Lieutenant Edelen re-entered the wing at approximately 1:17 p.m. (Defendants' Statement of Material and Genuine Facts ¶ 12; Edelen Decl. ¶ 18; Ex. N7, Fixed Wing Video at 13:17:28–13:17:57). Watson states he was naked, washing his face with cool water, and "crying in pain," though he denies he was yelling, banging, or kicking (Watson Decl. ¶ 115). Sergeant Rogers administered three one-second bursts (totaling 117g) of OC through the handcuffing portal of Watson's cell door (Defendants' Statement of Material and Genuine Facts ¶ 12; Edelen Decl. ¶ 18; Rogers Decl. ¶ 11; Ex. N7, Fixed Wing Video at 13:17:28–13:18:03). Lieutenant Edelen returned the canister to the secured storage area, weighed the canister, noted the weight in the log, and signed the log with the time as it appeared on his watch (Defendants' Statement of Material and Genuine Facts ¶ 12; Edelen Decl. ¶ 18, attached Chemical Agent Accountability Log).

Defendants state Watson continued to kick on his cell door and yell obscenities into the wing even after the second application of chemical agents (Defendants' Statement of Material and Genuine Facts ¶ 12; Edelen Decl. ¶ 18; Rogers Decl. ¶ 11). Watson states he experienced "unbelievably terrible pain which [he] cried about," but "did nothing disruptive, disorderly, or disobedient" (Watson Decl. ¶¶ 116, 118). Lieutenant Edelen returned to the wing at 1:24 p.m. and proceeded to Watson's cell (Ex. N7, Fixed Wing Video at 13:24:14). Watson states while Edelen and Rogers were at his cell, he was crying and told them he was in physical pain, his skin was peeling off his genitals, and he was declaring a medical and psychological emergency because he was suicidal (Watson Decl. ¶ 117). Watson states Edelen told Rogers he could "burn his ass up one more time with the C.S. can as soon as I heat it up for you" (*id.*, ¶ 118). Lieutenant Edelen left the wing at 1:25 p.m. (Ex. N7, Fixed Wing Video at 13:25:01). Edelen again contacted Duty Warden Michael Booker, who authorized the use of chemical agent Orthochlorbenzal Malononitrile ("CS") (Defendants' Statement of Material and Genuine Facts ¶ 12; Edelen Decl. ¶ 19, attached Authorization for Use of Force).

At approximately 1:30 p.m., Lieutenant Edelen re-entered wing two, and approximately one minute later Sergeant Rogers administered three one-second bursts (totaling 140g) of CS through the handcuffing portal of Watson's cell door (Defendants' Statement of Material and Genuine Facts ¶ 12; Edelen Decl. ¶ 19; Rogers Decl. ¶ 12; Ex. N7, Fixed Wing Video at 13:30:18–13:31:21). Watson complied with orders and ceased his disruptive behavior after this third application of chemical agents (Edelen Decl. ¶ 19; Rogers Decl. ¶ 12). Again, Watson denies he yelled, screamed, kicked, or banged at any time, and he submitted a declaration from another inmate stating the same (Watson Decl. ¶¶ 109, 111, 113, 115, 116, 119; doc. 159, Evans Decl. ¶ 15).

Officer Burt re-entered the wing with the handheld video camera at 1:35 p.m., and resumed recording (Ex. N7, Fixed Wing Video at 13:35:15). Watson exited his cell at 1:35 and was escorted to the shower cell of wing two for a cool water decontamination shower (Defendants' Statement of Material and Genuine Facts ¶ 13; Edelen Decl. ¶ 20; Rogers Decl. ¶ 13; Burt Decl. ¶ 2, incorporated facts from attached Incident Report; Ex. N7, Fixed Wing Video at 13:35:55–13:36:16, Ex. N8, Fixed Wing Video, Ex. N9, Fixed Wing Video at 13:36:16–13:37:22; Watson Dep. 198:2–10). He

showered for approximately nine minutes (Ex. N9, Fixed Wing Video at 13:37:22–13:46:38). Watson also received a clean pair of boxer shorts (Defendants' Statement of Material and Genuine Facts ¶ 13; Edelen Decl. ¶ 20; Rogers Decl. ¶ 13; Watson Depo. 198:11–17).

At approximately 1:46pm Watson was escorted to the medical triage room for a post-use-of-force physical examination from Senior Licensed Practical Nurse Doreen Von Oven (Defendants' Statement of Material and Genuine Facts ¶ 13; Edelen Decl. ¶ 20; Rogers Decl. ¶ 13; doc. 124-15, Declaration of Doreen Von Oven ¶ 2, attached Emergency Room Record; Ex. N9, Fixed Wing Video at 13:46:38–13:47:00, Ex. N10, Fixed Wing Video at 13:47:49).  Nurse Von Oven noted that Watson was alert, oriented to person, place, time, and situation, ambulated to medical without assistance, responded to questions verbally, made no complaints of pain, had no signs or symptoms of respiratory distress, and Watson's lungs were clear in all four quadrants (Von Oven Decl. ¶ 3, attached Emergency Room Record).  Nurse Von Oven noted only superficial lacerations to Watson's abdomen, left antecubital, and right antecubital from the earlier self-inflicted cutting (*id.*).  Watson did not exhibit any signs or symptoms of abdominal pain, and he made no complaints regarding any abdominal pain (Rogers Decl. ¶ 13; Von Oven Decl. ¶ 4).  If SLPN Von Oven had observed any signs or symptoms of abdominal pain, or if Watson had voiced any complaints of abdominal pain, Von Oven would have noted this in her record (Von Oven Decl. ¶ 4).  SLPN Von Oven provided treatment in the form of eye wash to both of Watson's eyes, and instructed Watson not to use any soaps or lotions for the next 24 hours and to use only cool water (*id.*).  Von Oven instructed Watson to follow up with sick call if needed (*id.*).  Von Oven referred Watson for a mental health evaluation (Von Oven Decl. ¶ 5, attached Staff Request/Referral). Watson left the medical triage room at 1:53 p.m. (Ex. N10, Fixed Wing Video at 13:52:56).  He was then escorted back to his cell and secured there at approximately 1:54 p.m. (Edelen Decl. ¶ 20; Rogers Decl. ¶ 13; Burt Decl. ¶ 2, incorporated facts from attached Incident Report; Ex. N10, Fixed Wing Video at 13:52:57–13:53:05, Ex. N11, Fixed Wing Video at 13:53:33–13:53:59, Ex. N12, Fixed Wing Video at 13:53:32–13:54:09, Ex. N13, Fixed Wing Video at 13:54:01–13:54:39). Officer Burt remained on wing two for approximately sixty minutes to monitor Watson for any signs of respiratory distress (Edelen Decl. ¶ 21; Burt Decl. ¶ 2, incorporated facts from attached Incident

Report).  Defendants state Watson's cell was decontaminated (Burt Decl. ¶ 2, incorporated facts from attached Incident Report), but Watson states chemical agents "remained all over" his cell (Watson Decl. ¶ 126).  The fixed wing video shows that while Watson was in the shower cell of wing two, an inmate with a mop and bucket entered the wing and left two minutes later (Ex. N9, Fixed Wing Video at 13:38:24, 13:40:42).

Watson states as a result of the use of force on March 1, 2012, he not only suffered a bloody nose, bloody knee, and bruised shoulder, but in the days and weeks that followed, he began to suffer syncope episodes (Watson Decl. ¶¶ 33–51).[14]  Additionally, he states he experienced numbness in his right hand, left knee, and both feet for several months after the use of force, which affected his daily mobility and physical abilities (Watson Decl. ¶¶ 33–34, 46–51; Watson Dep. 124:13–16).  Watson states as a result of the three applications of chemical agents on March 4, 2012, he suffered intense pain, which caused him to shake uncontrollably and involuntarily urinate and defecate (Watson Decl. ¶ 120).  He also states the chemicals caused him to vomit (from swallowing it), choke, and suffocate (*id.*).  He states he passed out twice upon being returned to his cell from the decontamination shower and medical evaluation (*id.*, ¶ 126).  He also states he felt a burning sensation for at least one week, and the chemicals burned the skin on his genitals, buttocks, arms, face, back, legs, and stomach, and caused blisters to develop, which eventually either scabbed over or peeled off with the skin (Watson Dep. 194:20–24; Watson Decl. ¶¶ 120, 123, 126, 131).

The evidence shows that in the weeks and months after the uses of force, Watson complained to the medical department that he was experiencing severe headaches and had "blacked out" on three occasions in his cell (*see* doc. 159, Exs. E-1, E-2, E-3, E-4, E-5, F-1, N).  On March 26, 2012, Watson was seen at sick call by Nurse Von Oven (Defendants' Statement of Material and Genuine Facts ¶ 18; Von Oven Decl. ¶ 6, attached Chronological Record of Health).  Watson complained of abdominal pain due to an object stuck in his abdomen, blackouts, headaches, dry scalp, allergies, and numbness to his feet, right hand, and left knee (*id.*).  Nurse Von Oven noted that Watson ambulated to medical without assistance, jumped upon the examination table without assistance, and

---

[14] In Watson's sick call request dated March 25, 2012, he stated he had a history of black-outs, but the episodes had been in remission until March 1, 2012 (doc. 159, Ex. F-1).

showed no signs or symptoms of distress (*id.*).  Nurse Von Oven noted that Watson's abdomen was soft and non-tender with no object felt on palpation (*id.*).  Nurse Von Oven observed no signs or symptoms of infection in Watson's abdomen and Watson did not exhibit any pain upon palpation (*id.*).  Nurse Von Oven noted that capillary refill was brisk to both of Watson's hands, Watson's hands and feet were warm to the touch with pulse palpable, and Watson had full range of motion to all extremities (*id.*).  Based upon her examination, Nurse Von Oven concluded that Watson was malingering and no treatment was needed (Von Oven Decl. ¶ 7, attached Chronological Record of Health).  She instructed Watson to obtain ibuprofen from security as needed, increase his fluid intake, and utilize sick call as needed (*id.*).

SLPN Von Oven attests that if there had actually been a sharpened paperclip lodged in Watson's abdomen on March 26, 2012, she would have been able to feel it on palpation even if it was under a layer of scar tissue (Von Oven Decl. ¶ 8).  She also states that if a paperclip had been in Watson's abdomen for three weeks, it would definitely have resulted in an infection (*id.*).  She states there would certainly have been a pronounced reaction from Watson when she pressed on the area if there was actually a sharpened paperclip lodged in his abdomen for three weeks (*id.*).  Von Oven states if Watson had any such reaction, she would have documented it in her record and referred it to the physician for further examination (*id.*).  SLPN Von Oven states that because she did not feel any object, because there were no signs or symptoms of distress when Watson presented, because there were no signs or symptoms of infection in Watson's abdomen, because Watson was able to jump up onto the examination table without assistance, and because there was no pain observed on palpation, she believed that Watson was fabricating his complaint about the object being lodged in his abdomen (*id.*).

On July 9, 2012, Watson was seen in the medical department by Licensed Practical Nurse Evans complaining that he blacked out and hit his head, from which he suffered an abrasion on his face and a swollen bottom lip (doc. 159, Exs. E-6, E-7, E-8, E-9).  During Evans's medical assessment, Watson began swaying (*id.*, Ex. E-8).  Watson was laid on the exam table, and he became unresponsive (*id.*).  His eyes rolled back in his head, his nail beds became white, his skin became pale and diaphoretic, he became stiff, and thick saliva was coming from his mouth (*id.*).  He

was placed in an infirmary cell overnight for observation (Exs. E-8, E-9). As of July of 2014, Watson was still receiving follow-up treatment for syncope episodes (*see* doc. 159, Ex. P-5).

On July 15, 2012, Watson was seen at sick call by SLPN Hawkins (Defendants' Statement of Material and Genuine Facts ¶ 19; Hawkins Decl. ¶ 9, attached Chronological Record of Health Care). Watson complained, "I am still having sudden loss of consciousness and serious head pains" (Hawkins Decl., attached Chronological Record of Health Care). Watson stated he was "still having serious pain in my stomach from sharp metal piece still inside there" (*id.*). Watson also stated he was "still noticing traces of blood in my stool and urine" and "still unable to regain full sensation in my right hand, left knee, or feet" (*id.*). SLPN Hawkins observed Watson and found no reasons for the loss of consciousness, but imposed a standing order that if Watson experienced another blackout, his condition should be discussed with an Advanced Registered Nurse Practitioner (*id.*). Hawkins noted Watson's abdomen was soft and non-tender with bowel sounds present in all four quadrants and no hernia noted (*id.*). Watson stated he was having normal bowel movements and voids, but there was blood in his stool and urine (*id.*). Hawkins noted that there was no metal present in Watson's abdomen, but he determined that hemoculture cups and a urine specimen were appropriate for addressing Watson's claims that he witnessed blood in his stool and urine (*id.*). Regarding Watson's complaint of decreased sensation, SLPN Hawkins noted several old scars to Watson's arms from self-inflicted lacerations (*id.*). Hawkins noted that capillary refill and pulses were normal (*id.*). Hawkins noted Watson had no active or acute injury to his right hand, left knee, or feet, and determined that the numbness was not a circulation issue, but questioned whether Watson "could have some superficial nerve involvement" for which treatment was not required (*id.*).

Hawkins states at a sick call follow-up two days later, on July 17, 2012, Watson was provided three stool cups, but he refused the urinalysis dipstick (Hawkins Decl. ¶ 9, attached Chronological Record of Health Care). Watson denies that he refused the dipstick (Watson Decl. ¶ 137). At a sick call follow-up two days later, on July 19, 2012, Watson was again given stool cups, and he again refused the urinalysis dipstick (Hawkins Decl. ¶ 9, attached Chronological Record of Health Care).

Watson states on July 28, 2012, he reported to the medical department with a medical emergency, because he stuck an "ink pen filler" approximately 1.5–2 inches into his abdomen, approximately two inches above his navel (Watson Decl. ¶¶ 159–62, Exs. P-1, P-2). Watson states Licensed Practical Nurse Evans assessed his injury (*id.*). LPN Evans noted that Watson's verbalized pain level was an eight out of ten (*id.*). LPN Evans notified a doctor, who ordered her to remove the object from Watson's stomach and place him in the infirmary on SHOS (*id.*). Evans removed the object, noting no bleeding before or after the removal (*id.*). LPN Evans noted that after the object was removed, Watson's abdomen was easily palpable, capillary refill was two seconds or less, there was no numbness or tingling, there was full range of motion, and there was no discharge from the wound that would indicate an infection (*id.*).

Watson states he requested an x-ray of his abdomen on several occasions from March of 2012 to April of 2013, but medical staff refused (Watson Decl. ¶¶ 136, 138, 139, 140, 186). Contrary to notations in his medical records, he denies he refused an x-ray on May 17, 2013 (*see id.*, ¶¶ 151, 157; *see also* doc. 124-18, Ex. 3). Watson's medical records indicate he engaged in several acts of self-harm, including self-mutilation, between March of 2012, and August of 2013 (*see* doc. 159, Exs. P-11, P-12, P-13). Watson states on August 20, 2013, he and other inmates were escorted to the outdoor recreation yard, and each inmate was locked in his own fenced-in partition (Watson Decl. ¶ 183). He states the guards left the area, and after he attempted to do sit-ups, he felt sharp, sudden pain in his abdomen (*id.*). Watson states he pulled up his prison shirt and, using a razor blade, made a very small incision into his scar tissue (*id.*, ¶ 184). Watson states he spread the incision and saw the tip of a paperclip (*id.*). He states he slowly pulled the embedded paperclip out of his abdomen, which was approximately two inches in length, but he felt "very little pain" and experienced no bleeding (*id.*). Watson submitted a declaration from Inmate Peter Gatlyn dated August 20, 2013, stating he was in the outdoor recreation area with Watson that morning (doc. 159, Ex. P-15, Declaration of Peter Gatlyn ¶ 2). Inmate Gatlyn states while he and Watson were doing "stomach exercises," Watson suddenly screamed in pain, and he saw Watson lie on his side holding his stomach (*id.*, ¶ 3). Gatlyn states Watson then pulled up his shirt, exposing scar tissue on a small area of his stomach above his belly button (*id.*, ¶ 6). Inmate Gatlyn states he saw Watson cut the

scar tissue and pull at the top of the cut until he removed what appeared to be a straightened piece of paperclip approximately two inches long (*id.*, ¶ 7).  Gatlyn states the officers returned to the recreation yard at approximately 10:30 a.m. (*id.*, ¶ 8).

Watson states the next day, on August 21, 2013, he submitted a sick-call request stating that he had extracted a piece of metal from his stomach the previous day and was now experiencing vomiting, diarrhea, and abdominal pain (Watson Decl. ¶ 186; doc. 159, Ex. P-18).  Watson states he was assessed by a nurse on August 22, 2013, and the nurse notified Dr. Nazareno (Watson Decl. ¶ 187; doc. 124-18, Ex. 2).

Watson admits that in May of 2014, he pushed two paperclips completely into his stomach (Watson Decl. ¶¶ 162, 177).  He states x-rays dated June 13, 2014 and July 30, 2014, documented the two pieces of metal embedded in his stomach, but the FDOC medical staff has refused to remove them because they are causing no acute distress or other medical concern, even though Watson has complained of pain for months (Watson Decl. ¶¶ 163–74, 177–78. Exs. P-3, P-4, P-5, P-6, P-7, P-8, P-9, P-10).

Dr. Long Ngoc Do, the Director of Medical Services for the Florida Department of Corrections, reviewed the record of Watson's deposition from November 21, 2013, the operative complaint in this case, and a portion of Watson's medical records (Defendants' Statement of Material and Genuine Facts ¶ 20; doc. 124-18, Declaration of Dr. Long Ngoc Do).  Based upon this review, Dr. Do stated that Watson's allegations regarding a paperclip being rammed all the way into his abdomen, remaining in his abdomen for seventeen months, and being cut out of his abdomen on the recreation yard are not consistent with Watson's medical records or medical science (Do Decl. ¶¶ 2–10).  Specifically Dr. Do stated the following:

a) A foreign body like the one Watson indicated is not likely to be missed during examination of the abdomen, even if it is covered by scar tissue, because painful palpation of the abdomen is a major symptom.

b) Watson's medical records do not reflect a sick-call visit where he requested an X-ray to detect a foreign body in his abdomen.  Watson's medical records do, however, reflect that when he was set to have an X-ray of his lumbar spine on May 17, 2013, which could have revealed the absence of a metal paperclip in his

abdomen, Watson refused the X-ray and then ate the refusal form instead of signing it.

c) Watson indicated during his deposition that he cut approximately a quarter of an inch deep into his subcutaneous tissue and pulled the foreign object out with his fingers. I seriously question Watson's ability to perform the extraction surgery in the manner he described. Such an incision would also cause bleeding that would likely have been noticed by security or medical staff when Watson was escorted back into the Crisis Stabilization Unit. A recent incision would also have been apparent when Watson's abdomen was examined two days later, but there is no reference to any such injury despite Watson being examined for complaints of abdominal pain and being in a Crisis Stabilization Unit where patients are monitored for signs of self-harm.

d) It would be almost impossible for a nurse to quickly and easily push a piece of a paperclip into Watson's abdominal wall. This is confirmed by Watson stating during his deposition that he himself needed to lean up against the wall in order to force the paperclip halfway into his abdomen.

e) If a two-inch long paperclip was pushed through the abdominal wall above the navel, there would have been moderate to acute pain due to perforation of the intra-abdominal viscera. If left in place for an extended period of time, infection may set in causing painful swelling, suppuration of the abdominal wall, and acute intra-peritoneal infection. It is medically impossible for such a foreign object to stay inside of a person's abdominal wall for 17 months without complication or infection.

(Do Decl. ¶ 10).

IV.    LEGAL STANDARDS

A.    Summary Judgment Standard

In order to prevail on their motion for summary judgment, Defendants must show that Watson has no evidence to support his case or present affirmative evidence that Watson will be unable to prove his case at trial. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2553–54, 91 L. Ed. 2d 265 (1986). If Defendants successfully negate an essential element of Watson's case, the burden shifts to Watson to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248.  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*  Watson must show more than the existence of a "metaphysical doubt" regarding the material facts.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  Speculation or conjecture from a party cannot create a genuine issue of material fact.  *See* Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005).  "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment."  Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004); *see also* Celotex Corp., 477 U.S. at 324.  Watson must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  *See* Celotex Corp., *supra*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by Watson in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him.  *See* Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th Cir. 1999).  Nonetheless, Watson still bears the burden of coming forward with sufficient evidence of every element that he must prove.  *See* Celotex Corp., 477 U.S. at 317.  A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322.

B.    Excessive Force

Claims of excessive force by prison officials fall under the Eighth Amendment's proscription against cruel and unusual punishment.  The standard applied to Eighth Amendment claims has a subjective and an objective component.  As to the objective component, "not every malevolent touch

by a prison guard gives rise to a federal cause of action."  Wilkins v. Gaddy, 559 U.S. 34, 37, 130 S. Ct. 1175, 1178 (2010) (citing Hudson v. McMillian, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)).   An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim.  Hudson, 503 at 9 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).   "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'"  Hudson, 503 U.S. at 10 (citation omitted).  Accordingly, the Eleventh Circuit requires that the plaintiff suffer more than a *de minimis* injury to establish an Eighth Amendment violation, although courts must remain mindful of the fact that a significant injury is not required.  *See* Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002).

Under the subjective component, to sustain an Eighth Amendment challenge it must be shown that prison officials' actions amounted to an "unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084, 89 L.  Ed. 2d 251 (1986).  "Force is deemed legitimate in a custodial setting as long as it is applied 'in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm.'"  Skrtich v. Thornton, 280 F.3d 1295, 1300 (11th Cir. 2002) (quoting Whitley, 475 U.S. at 320–21).  In determining whether an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including these five:  "the need for the application of force; the relationship between that need and the amount of force used; the extent of the threat to the safety of staff and inmates, as reasonably perceived by officials; the extent of injury; and any efforts made to temper the severity of the response."  Hudson, 503 U.S. at 7–8; *see also* Whitley, 475 U.S. at 321; Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999).  From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur."  Whitley, 475 U.S. at 321 (quoting Johnson, 481 F.2d at 1033).  Although the absence of serious injury is relevant to an excessive force claim, the core judicial inquiry is not whether a quantum of injury was sustained but rather whether force was applied in a good-faith

effort to maintain or restore discipline or whether it was applied maliciously and sadistically to cause harm.  *See* Wilkins, 559 U.S. at 37; *see also* Hudson, 503 U.S. at 4.  Additionally, under Eleventh Circuit law, in cases in which a collective use of force is alleged, the court need not analyze separately the force administered by each officer to determine which of the blows or other acts, if any, constituted the use of excessive force.  Skrtich, 280 F.3d. at 1302.

That officials followed prison regulations in administering force or restraint provides evidence that they acted in good faith and not to inflict pain.  Campbell, 169 F.3d at 1376 (citation omitted).  Thus, as summarized in Campbell, "[p]recedent dictates that [the determination whether defendants acted maliciously and sadistically for the very purpose of causing harm] be guided by the five Hudson/Whitley factors outlined above, by deference to prison officials' punitive judgments, and by this Court's previous holdings that compliance with prison policies evidences officials' good faith."  *Id.*

The Court in Whitley narrowed the precise inquiry applicable when deciding whether officials are entitled to judgment as a matter of law:

> courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives.  Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury.

Whitley, 475 U.S. at 322 (emphasis added).

    C.    <u>Failure to Provide Adequate Medical and Mental Health Care</u>

Prison officials violate the Eighth Amendment when they act with deliberate indifference to an inmate's serious medical needs.  *See* Estelle v. Gamble, 429 U.S. 97, 104–05, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976).  To prevail on a claim of deliberate indifference, a plaintiff must show (1) a serious medical need; (2) deliberate indifference to that need on the part of the defendant; and (3) causation between the defendant's indifference and the plaintiff's injury.  *See* Mann, 588 F.3d at 1306–07.  A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Id.* at 1307 (quotation omitted).  Alternatively, a plaintiff can establish a serious medical need by showing that a delay in treatment worsened his or her condition.  *Id.*

To establish deliberate indifference, a plaintiff must show "(1) a subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." Goodman v. Kimbrough, 718 F.3d 1325, 1331–32 (11th Cir. 2013) (internal quotation marks omitted). Indeed, to show deliberate indifference, the defendant's response to the medical need must be more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000) (citation and quotations omitted). Conduct that is more than mere negligence includes: (1) knowledge of a serious medical need and a failure or refusal to provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision to take an easier but less efficacious course of treatment; or (5) medical care that is so cursory as to amount to no treatment at all. See McElliott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). A simple difference in medical opinion between the medical staff and an inmate as to the latter's diagnosis or course of treatment does not establish deliberate indifference. See Adams v. Poag, 61 F. 3d 1537, 1545 (11th Cir. 1995) (the question of whether a plaintiff should have received different diagnostic tests or treatments is not an appropriate basis for grounding liability on a deliberate-indifference claim); Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991).

A prisoner's Eighth Amendment right to receive adequate medical treatment encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide. Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1115 (11th Cir. 2005) (quoting Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir. 1994)). To establish liability for a prisoner's self-harm, under section 1983, the plaintiff must show that the jail official displayed "deliberate indifference" to the prisoner's physically harming himself. See Cook, 402 F.3d at 1115 (internal quotation marks and citation omitted). "[D]eliberate indifference requires that the defendant deliberately disregard 'a strong likelihood rather than a mere possibility that the self-infliction of harm will occur.'" Id. "[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners." Tittle v. Jefferson Cnty. Comm'n, 10 F.3d 1535, 1540 (11th Cir. 1994) (en banc). To be deliberately indifferent to a strong likelihood that the prisoner will harm himself, the official must be subjectively

aware that the combination of the prisoner's self-harm tendencies and the feasibility of self-harm in the context of the prisoner's surroundings creates a strong likelihood that the prisoner will self-inflict harm.  *See* <u>Gish v. Thomas</u>, 516 F.3d 952, 954–55 (11th Cir. 2008).

      D.    <u>Qualified Immunity</u>

Qualified immunity protects government officials from liability for civil damages unless they violate a statutory or constitutional right that was clearly established at the time the alleged violation took place.  *See* <u>Pearson v. Callahan</u>, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009); <u>Amnesty Int'l, USA v. Battle</u>, 559 F.3d 1170, 1184 (11th Cir. 2009).  "The purpose of [qualified] immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'"  <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).  Qualified immunity is a defense not only from liability, but also from suit, so courts should ascertain the validity of a qualified immunity defense as early in the lawsuit as possible.  *See id.*

"Under the well-defined qualified immunity framework, a 'public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'"  <u>Terrell v. Smith</u>, 668 F.3d 1244, 1250 (11th Cir. 2012) (quoting <u>Lee</u>, 284 F.3d at 1194).[15]  Once the official has done so, the burden shifts to the plaintiff to satisfy the following two-pronged inquiry:  (1) whether the facts that a plaintiff has shown make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct.  *See* <u>Pearson</u>, 555 U.S. at 232; *see also* <u>Lewis v. City of West Palm Beach</u>, 561 F.3d 1288, 1291 (11th Cir. 2009) (the plaintiff has the burden of showing that the official is not entitled to qualified immunity).  The Supreme Court made clear in <u>Pearson</u> that a court need not employ a rigid two-step procedure, but rather may exercise its discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  555 U.S. at 236.

---

[15] In this case, there is no dispute that Defendants were acting in their discretionary capacities.

A constitutional violation may be clearly established either by similar prior precedent, or in rare cases of "obvious clarity." Coffin v. Brandau, 642 F.3d 999, 1013–14 (11th Cir. 2011).  With either method, the touchstone is whether the right would be apparent to a reasonable officer.  *Id.* Under the first approach, the court looks only to binding precedent—holdings of cases drawn from the United States Supreme Court, the Eleventh Circuit, or the highest court of the state where the events took place.  *See id.* at 1013; Amnesty Int'l, 559 F.3d at 1184.  "Exact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law."  Coffin, 642 F.3d at 1013.  The qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Id.* (quoting Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)).  An official's awareness of an abstract right "does not equate to knowledge that his conduct" may infringe that right.  *Id.* at 1015 (quoting Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)).  Further, "officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases."  *Id.*

"Obvious clarity" cases are "rare," Coffin, 642 F.3d at 1015, and present a "narrow exception" to the general rule of qualified immunity, Lee, 284 F.3d at 1199.  These obvious clarity cases take two forms.  Gilmore, 2013 WL 6698070, at *11.  First, a broad statement of legal principle announced in case law may be sufficient if it establishes the law "'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002).  Alternatively, obvious clarity is recognized if the conduct is "so bad that case law is not needed to establish that the conduct cannot be lawful."  *Id.* at 1350.


V.     DISCUSSION

   A.     Excessive Force

      1.     Beating on March 1, 2012

Watson claims that Defendants Edelen and Johnson used excessive force on March 1, 2012, by beating him on the way to the infirmary.  Defendants contend the use of force was spontaneous and justified, the amount of force used was reasonable in light of the circumstances, and Watson's

injuries were *de minimis*.  Defendants submitted evidence showing that Watson attempted to pull away from the custodial grasp of officers, and they had to force him to the sidewalk in order to regain control of him.  Defendants' evidence further shows that Watson continued resisting while on the ground, thus requiring them to hold him on the ground until he ceased his combative behavior.  However, Watson's verified declaration states he was not combative, aggressive, violent, or physically resistant in any way during the escort, and he did nothing to justify the officers' slamming him to the concrete sidewalk face first while snatching his ankle shackles out from under him and then striking his head, nose, back, and feet, and twisting his wrists and fingers.

Viewing Defendants' and Watson's conflicting evidence in the light most favorable to Watson, as is proper at summary judgment, the court must accept Watson's version of these facts: Watson did not display any physically resistant conduct during the escort.   Thus, the Hudson/Whitley "need for the application of force" factor weighs in Watson's favor.  Accepting for purposes of summary judgment that there was no need to apply force to control Watson, the court must likewise conclude at this stage of the litigation that the remaining Hudson/Whitley factors—the relationship between the need to apply force and the amount of force used, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of the response—also favor Watson.

Furthermore, accepting Watson's version of the facts as true, his injuries were not *de minimis*.  As a result of this incident, he states he not only suffered a bloody nose, bloody knee, and bruised shoulder, but in the days and weeks that followed, he also experienced numbness in his right hand, left knee, and both feet, and he began to suffer syncope episodes for which he apparently is still being treated.

Under Watson's version of events, there was no need for the use of force.  Such a gratuitous use of force on a handcuffed, shackled, and physically compliant prisoner constitutes a violation of the Eighth Amendment's prohibition on the use of excessive force.  *See* Wilkins, 559 U.S. at 37 (concluding that a gratuitous beating by prison guards, even without serious injuries, violated a prisoner's Eighth Amendment rights).  Additionally, given that Watson's evidence, if credited by a jury, establishes an Eighth Amendment violation, Defendants Edelen and Johnson are not entitled

to qualified immunity at the summary judgment stage.  *See* Fennell v. Gilstrap, 559 F.3d 1212, 1216–17 (11th Cir. 2009); Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002); Johnson v. Breeden, 280 F.3d 1308, 1321–22 (11th Cir. 2002); *see also* Danley v. Allen, 540 F.3d 1298, 1310 (11th Cir. 2008), *overruled on other grounds by* Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

2.      Applications of Chemical Agents on March 4, 2012

Watson claims that Defendants Edelen and Rogers used excessive force on March 4, 2012, by spraying him with chemical agents.[16]

Defendants contend the application of chemical agents on March 4 was justified and reasonable in light of the circumstances, and Watson's injuries were *de minimis*.  Defendants submitted evidence showing that Watson engaged in disruptive behavior and created a disturbance by kicking on his cell door and yelling obscenities, which posed a safety risk to other inmates and correctional staff.  Defendants' evidence shows they applied chemical agents three separate times during a 22-minute period—the first two times using OC and the third time using CS—to obtain Watson's compliance with their commands to cease his disruptive behavior.

However, Watson's verified declaration and the declaration of Inmate Evans state Watson was never yelling, screaming, kicking, banging, or otherwise creating a disturbance on the wing on

---

[16] Watson also alleges Defendant Hawkins planned the use of chemical agents with Defendant Edelen (*see* doc. 33 at 14, ¶15).  He thus appears to assert liability as to Hawkins on a conspiracy theory.  Under the intracorporate conspiracy doctrine, a corporation's employees cannot conspire among themselves when acting in the scope of their employment, as their actions are attributed to the corporation itself, "thereby negating the multiplicity of actors necessary for the formation of a conspiracy."  Grider v. City of Auburn, 618 F.3d 1240, 1261 (11th Cir. 2010) (quotations omitted).  The intracorporate conspiracy doctrine prohibits a § 1983 claim against law enforcement officers in their individual capacities, *see id.* at 1261–62, as well as claims that do not seek to hold the corporate entity itself responsible for its agents' actions, *see* Rehberg v. Paulk, 611 F.3d 828, 854 (11th Cir. 2010) (noting that the only portion of a conspiracy claim that remained were the allegations against a prosecutor alone, and that the claim was barred by the intracorporate conspiracy doctrine).  Here, there is no dispute that Defendants Hawkins and Edelen were acting within the scope of their employment during their encounters with Watson.  *See* Grider, 618 F.3d at 1261 ("The scope-of-employment inquiry is whether the employee [] officer was performing a function that, but for the alleged constitutional infirmity, was within the ambit of the officer's scope of authority (*i.e.*, job-related duties) and in furtherance of the employer's business.").  Therefore, Watson's complaint fails to state a plausible claim against Defendant Hawkins for his allegedly planning the use of chemical agents with Edelen.  *See, e.g.*, Detris v. Coats, 523 F. App'x 612, 615–16 (11th Cir. 2013) (unpublished) (intracorporate conspiracy doctrine barred arrestee's § 1983 claims against deputies in their individual capacities alleging one deputy instructed other deputies to use excessive force, and other deputies agreed to do so); Hollins v. Fulton Cnty., 422 F. App'x 828, 832 (11th Cir. 2011) (unpublished) (intracorporate conspiracy doctrine barred terminated deputy's claim that sheriff and chief deputy sheriff conspired to violated her due process rights).

March 4, 2012.  Viewing Defendants' and Watson's conflicting evidence in the light most favorable to Watson, the court must accept Watson's version of these facts:  Watson did not engage in any disruptive behavior.  Thus, the <u>Hudson/Whitley</u> "need for the application of force" factor weighs in Watson's favor.  Accepting for purposes of summary judgment that there was no need to apply force to control Watson, the court must likewise conclude at this stage of the litigation that three more <u>Hudson/Whitley</u> factors—the relationship between the need to apply force and the amount of force used, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of the response—also favor Watson.

Under Watson's version of events, there was no need for the use of chemical agents, let alone the amount used in light of the three separate applications.  Three applications of chemical agents on a completely non-disruptive and compliant prisoner supports a reliable inference that the use of force was a gratuitous, wanton infliction of pain, which constitutes a violation of the Eighth Amendment's prohibition on the use of excessive force.  *See* <u>Wilkins</u>, 559 U.S. at 37 (concluding that a gratuitous beating by prison guards, even without serious injuries, violated a prisoner's Eighth Amendment rights).  Given that Watson's evidence, if credited by a jury, establishes an Eighth Amendment violation, Defendants Edelen and Johnson are not entitled to qualified immunity at the summary judgment stage.  *See* <u>Fennell</u>, 559 F.3d at 1216–17; <u>Skrtich</u>, 280 F.3d at 1301; <u>Johnson</u>, 280 F.3d at 1321–22; <u>Danley</u>, 540 F.3d at 1306; *see also, e.g.,* <u>J.W. ex. rel. Williams v. Roper</u>, 541 F. App'x 937, 942–43 (11th Cir. 2013) (unpublished) (school resource officer who used chemical spray on a high school student a second time, when she was allegedly incapacitated, non-resistant, and writhing in pain on the ground, was not entitled to qualified immunity against § 1983 claims, even if the first use of chemical spray was reasonable due to the student's resistance); <u>Gunn v. Sullivan</u>, No. 2:04cv229-FtM-99SPC, 2007 WL 80859, at *4 (M.D. Fla. Jan. 8, 2007) (unpublished) (at summary judgment stage, correctional officers who sprayed chemical agents on inmate when there was no need were not entitled to qualified immunity against Eighth Amendment claim of excessive force).

      B.    <u>Deliberate Indifference to Serious Mental Health Needs</u>

          1.    Defendants Edelen and Hawkins on March 1, 2012

Watson contends Defendants Edelen and Hawkins were deliberately indifferent to his mental health needs on March 1, 2012, by convincing the psychiatrist to return Watson to his cell after he declared a psychological emergency and engaged in self-injurious behavior (cutting his forearms and forehead with a dull razor blade), instead of maintaining him on SHOS status.

The undersigned is aware of <u>Snow ex re. Snow v. City of Citronelle, AL</u>, 420 F.3d 1262 (11th Cir. 2005), in which the Eleventh Circuit held that the following facts would establish an Eighth Amendment claim that a correctional officer was deliberately indifferent to an inmate's risk of self-harm: (1) the defendant officer telephoned another correctional institution, and a jailor told him that within the last month, the inmate had "given them a lot of trouble" and tried to cut her wrist; (2) the defendant officer observed the inmate beat on her cell door, climb on the sink in her cell, charge at the officer, beat on the cell window, and attempt to hit the officer; (3) the defendant officer told the inmate's parents that the inmate was suicidal; (4) the defendant officer went off duty without communicating to anyone else at the jail his belief that the inmate was a strong suicide risk; and (5) despite the defendant officer's belief that the inmate was a strong suicide risk, the officer admitted he did not monitor the inmate as if she were suicidal, which would have included visual checks every fifteen (15) minutes and removal of items from her cell with which she could have harmed herself, nor did officer return the inmate to the hospital from which she had been released into the police custody. *Id.* at 1266–67, 1270.[17]

The undisputed evidence shows that upon Lieutenant Edelen's learning that Watson declared a psychological emergency and made threats and gestures of self harm, Edelen notified Mental Health Specialist Lena Lyons. Lyons came to Watson's cell and remained there until Watson was escorted to the mental health group room, where Lyons initially evaluated him. Edelen then accompanied Watson to the medical triage room for treatment of his self-inflicted injuries. After SLPN Hawkins treated Watson's physical injuries, Edelen accompanied Watson to the infirmary for assessment by the mental health staff. After nearly six hours of observation by medical/mental

---

[17] There is other binding precedent establishing that certain facts would demonstrate deliberate indifference to an inmate's risk of suicide, but those cases concern conduct of psychiatrists and other mental health officials. *See* <u>Greason v. Kemp</u>, 891 F.2d 829 (11th Cir. 1990); <u>Rogers v. Evans</u>, 792 F.2d 1052 (11th Cir. 1986).

health staff, Dr. Iserman, a psychiatrist, released Watson from observation because he found "no basis or reason in fact to refer for a higher level of psychiatric treatment," in light of Watson's "current presentation," refusal to cooperate, and history indicative of repeated attempts to manipulate and failure to comply with treatment interventions.  Dr. Iserman's declaration also states he did not receive any input from SLPN Hawkins, and all of his psychiatric evaluations of Watson on March 1, 2012, were based upon his own professional opinion in light of his objective observations and his review of Watson's medical records.

Watson has not submitted evidentiary material demonstrating a genuine issue of fact for trial as to his claim that Defendants Edelen and Hawkins were deliberately indifferent to his serious mental health needs on March 1, 2012.  Viewing the evidence in the light most favorable to Watson, he failed to show an Eighth Amendment violation; therefore, Defendants Edelen and Hawkins are entitled to summary judgment on this Eighth Amendment claim of deliberate indifference to serious mental health needs.

> 2.      Defendants Edelen, Rogers, and Hawkins on March 4, 2012

Watson contends Defendants Edelen, Rogers, and Hawkins were deliberately indifferent to his serious mental health needs on March 4, 2012, by failing to notify mental health staff when he declared a psychological emergency and engaged in self-injurious behavior (cutting his arms and inserting two metal objects into his stomach) and instead only took him to the medical department for assessment of his physical injuries and then returned him to his cell.  Unlike the circumstances in Snow, Watson did not have a genuine desire to harm himself on March 4, 2012—he admitted in his deposition that he cut his arms and poked two pieces of metal in his abdomen but for the sole purpose of avoiding the application of chemical agents (Watson Dep. 152:4–16, 153:19–154:1–8, 154:21–157:4).  He even admitted, "I put them where they still stick out.  I want to make sure the camera see them," and "I didn't want to go too far in and hit my intestines" (Watson Dep. 149:21–22, 150:23–24).  Watson continued:

> Q.      So you put them in but not far enough to hit your intestines?
>
> A.      I wanted to make sure that they were out, so when they bring the camera, because I've see inmates cut and that, for some reason, isn't good enough to get mental health protection from the gas.  So I made sure that they were more than

visible outside my stomach so that, you know, this is serious, you can't put him back in the cel [sic], we have to put him on SOS.

Q.      Okay. so you weren't trying to kill yourself?

A.      No, no, no.
. . . .
A.      I was trying to escape the gas.

(Watson Dep. 152:2–16).

Watson continued:

A.      And so I look and as soon as I seen [sic] it was a white shirt with them, I go to screaming, I've got a psych—I'm doing my thing, I've got a psychological emergency, I'm suicide [sic], I want to kill myself, you know, so they don't gas me because I know for a fact, if I don't say that, they're going to turn the camera off and they're going to come and gas me for nothing.
. . . .

        I wanted to make sure that I called out that I had a psych emergency before he went to talking all this crazy stuff about stop being disorderly and this is your last chance. And I didn't even want them to get that out, because I know that's part of his game to justify gassing me. So I wanted to put my part out first. I have a psychological emergency. I'm trying to hurt myself, I've cut—I think, well, I know for a fact, I even got up on the toilet and tried to get up in the window to show the camera, because that was the most important thing, my stomach. I don't know if the camera caught it or not, but I know I tried to get up there. I notified all of them that I had cut—I notified all of them that I had stabbed myself in the stomach. They called nurse Hawkins to check me out. And I kept saying the same thing, I'm suicidal, you're not mental health, I've got a psychological emergency. Well, so he was like, well, you've got to come out your cell for me to attend your wounds. And I'm like this dude isn't even mental health, I know it's a trap. But it was a trap I couldn't get out of because I do have things they have to medically treat.

        So I was like I a stalemate [sic], I had nothing else to do. So they say, I'm going to go in and cuff up and they cuffed me up. They turned the camera off. And I come out of my cell, and . . . [w]hen I got around between Boo-Boo's cell and Amos cell [sic], I had felt the pain was so bad, I was worried it was in my intestines and I didn't want to move no more because it started, I guess, the way I was moving, walking. And I fell down and I started crying because it had hurt real bad.

(Watson Dep. 156:3–157:13).

Given that Watson did not have a genuine desire to harm himself on March 4, 2012, and thus did not have a serious mental health need, he cannot establish an Eighth Amendment violation against Defendants Edelen, Rogers, and Hawkins.  Therefore, Defendants are entitled to summary judgment in their favor.

C.   Deliberate Indifference to Serious Medical Needs

Watson claims that Edelen, Rogers, and Hawkins were deliberately indifferent to his serious medical needs on March 4, 2012.  He specifically asserts SLPN Hawkins failed to notify a physician of injuries he suffered as a result of his self-injurious behavior (*i.e.*, cutting his forearms and placing two pieces of metal into his abdomen), and Hawkins forced a piece of metal into his abdomen.  Watson asserts Edelen and Rogers were present when Hawkins forced the metal piece into his abdomen, but they failed to stop him.

SLPN Hawkins's affidavit states Watson had superficial lacerations to his abdomen that were less than one centimeter deep.  He states at no time did he see any metal "rods," as Watson described them, stuck in Watson's abdomen, nor was there any embedded foreign material in his abdomen.  SLPN Hawkins adamantly denies he either forced a metal "rod" into Watson's abdomen or pulled one out.  Hawkins states Watson's allegations are "completely made up."  Edelen and Rogers submitted their own affidavits stating at no time did they see any metal sticking out of Watson's abdomen, and at no time did they see SLPN Hawkins push a metal "rod" into Watson's abdomen or pull one out.

Watson's declaration states the two pieces of metal were still in his abdomen when he exited his cell, and he saw the metal pieces still sticking out of his abdomen when he collapsed to the floor outside his cell on his side.[18]  Inmate Evans states he saw a "shinny metal-like object" sticking out of Watson's abdomen before Watson fell on the floor and after he got up.  Additionally, Watson

---

[18] The undisputed evidence shows that Officer Burt, the handheld video camera operator, left the wing prior to Watson's exiting his cell and did not resume recording until nearly an hour after Watson was treated by SLPN Hawkins.  Therefore, the handheld video would not have depicted whether metal was sticking out of Watson's abdomen when he exited his cell, during his escort to the medical triage room, or while he was in the medical triage room with Hawkins.

submitted evidence that on August 20, 2013, he extracted an imbedded piece of metal from his abdomen.

Defendants argue they have affirmative evidence refuting Watson's claim that a piece of metal was embedded in his abdomen from March 4 2012 to August 20, 2013, specifically, opinions from Dr. Do. and SLPN Von Oven that Watson's allegation that Hawkins shoved a metal "rod" into Watson's stomach is not consistent with his medical records or medical science.  SLPN Von Oven attests that if there had actually been a sharpened paperclip lodged in Watson's abdomen when she examined him on March 26, 2012, she would have been able to feel it on palpation even if it was under a layer of scar tissue.  She states there would certainly have been a pronounced reaction from Watson when she pressed on the area if there was actually a sharpened paperclip lodged in his abdomen for three weeks.  Von Oven states if Watson had any such reaction, she would have documented it in her record and referred it to the physician for further examination.  She also states that if a paperclip had been in Watson's abdomen for three weeks, it would definitely have resulted in an infection.

Additionally, Dr. Do rendered the following opinion:

a) A foreign body like the one Watson indicated is not likely to be missed during examination of the abdomen, even if it is covered by scar tissue, because painful palpation of the abdomen is a major symptom.

b) Watson's medical records do not reflect a sick-call visit where he requested an X-ray to detect a foreign body in his abdomen.  Watson's medical records do, however, reflect that when he was set to have an X-ray of his lumbar spine on May 17, 2013, which could have revealed the absence of a metal paperclip in his abdomen, Watson refused the X-ray and then ate the refusal form instead of signing it.

c) Watson indicated during his deposition that he cut approximately a quarter of an inch deep into his subcutaneous tissue and pulled the foreign object out with his fingers.  I seriously question Watson's ability to perform the extraction surgery in the manner he described.  Such an incision would also cause bleeding that would likely have been noticed by security or medical staff when Watson was escorted back into the Crisis Stabilization Unit.  A recent incision would also have been apparent when Watson's abdomen was examined two days later, but there is no reference to any such injury despite Watson being examined for complaints of abdominal pain and

being in a Crisis Stabilization Unit where patients are monitored for signs of self-harm.

d) It would be almost impossible for a nurse to quickly and easily push a piece of a paperclip into Watson's abdominal wall. This is confirmed by Watson stating during his deposition that he himself needed to lean up against the wall in order to force the paperclip halfway into his abdomen.

e) If a two-inch long paperclip was pushed through the abdominal wall above the navel, there would have been moderate to acute pain due to perforation of the intra-abdominal viscera. If left in place for an extended period of time, infection may set in causing painful swelling, suppuration of the abdominal wall, and acute intra-peritoneal infection. It is medically impossible for such a foreign object to stay inside of a person's abdominal wall for 17 months without complication or infection.

Watson argues that his allegation is not inconsistent with his medical records or medical science. Watson submitted evidence that he complained of blood in his urine and stool for several months after March 4. He also submitted evidence that on July 28, 2012, after he stuck an "ink pen filler" into his abdomen, it was removed by medical staff with no bleeding (Watson Decl. ¶¶ 159–62), which he contends refutes Dr. Do's opinion that Watson could not have extracted the piece of metal from his own abdomen as he described without any bleeding or visible evidence of the extraction.

Watson also submitted evidence showing that in May of 2014, he embedded two 2-inch pieces of metal into his stomach, which is medically documented in x-rays, yet as of September of 2014 (four months later) FDOC medical providers refused to remove the metal pieces because they do not appear to be creating any acute distress and there is no medical need to remove them (Watson Decl. ¶¶ 163–78; doc. 159, Exs. P-6, P-7, P-8, P-9, P-10). Watson asserts this medical evidence refutes Dr. Do's opinion that the piece of metal allegedly pushed into his abdomen by Hawkins would not likely be missed during examination of the abdomen, because painful palpation of the abdomen is a major symptom, and it is medically impossible for such a foreign object to stay inside of a person's abdominal wall for seventeen months without complication or infection.

Watson's evidence is insufficient to create a genuine issue of material fact as to whether SLPN Hawkins forced a piece of metal into his abdomen. He failed to present sufficient evidence to show a genuine issue of material fact as to whether any metal was sticking out of his abdomen

at the time he arrived in the medical triage room or at any time during Hawkins's interaction with him in the medical triage room.  Watson admitted in his deposition that he did not actually <u>see</u> Hawkins do anything with the metal pieces (Watson Dep. 160:2–161:13; 163:12–23).  Further, he made vague and somewhat contradictory statements as to how he came to believe that Hawkins had pushed one piece of metal into his abdomen and taken the other out.  Watson stated he "felt" Hawkins remove one piece of metal (Watson Dep. 161:4), yet he also stated he did not know that Hawkins had removed one piece of metal until "months and months later" (Watson Dep. 159:25–160:3).  Regarding the other metal piece, Watson stated he "felt it when he [Hawkins] hit it in" (Watson Dep. 160:12–14), yet he also stated he "thought" Hawkins had removed both pieces (Watson Dep. 161:3–5).

Additionally, accepting as true that Watson had blood in his urine and stool for several months after March 4, there is no evidence suggesting the cause of those symptoms, let alone that the symptoms were caused by a piece of metal embedded by Hawkins as opposed to something else, for example, the razor blade and batteries Watson alleges he swallowed on March 1, 2012 (*see* Watson Decl. ¶ 8).  Further, even crediting Watson's evidence that he removed a piece of metal from his abdomen on August 20, 2013, there is insufficient evidence from which a reasonable jury could infer that Hawkins was the person who put it there seventeen months earlier, especially in light of the medical evidence documenting Watson's self-mutilating behavior between March of 2012 and August of 2013 (when Watson allegedly removed an embedded piece of metal from his abdomen), and Watson's admission that he embedded two pieces of metal into his own abdomen in May of 2014.

Watson's evidence is insufficient to create a genuine issue of material fact as to whether Defendant Hawkins shoved a piece of metal into Watson's abdomen.  In the absence of such evidence, Defendant Hawkins is entitled to summary judgment on Watson's Eighth Amendment claims of excessive force and denial of adequate medical treatment arising from Hawkins's allegedly inflicting such injury.

Additionally, the evidence fails to show SLPN Hawkins was deliberately indifferent to Watson's need for medical treatment of the injuries he inflicted upon himself on March 4.  Hawkins

cleaned and dressed Watson's lacerations.  Watson contends Hawkins should have contacted a physician regarding his injuries; he asserts Hawkins notified Dr. Iserman on March 1, which suggests Hawkins also should have notified a physician on March 4.  However, Dr. Iserman was assigned as a psychiatrist and was thus notified of Watson's mental health condition on March 1, not Watson's physical injuries.  There is no evidence that SLPN Hawkins knew that Watson's self-inflicted injuries posed a serious medical need, or that he failed or refused to provide care, provided grossly inadequate care, or provided such cursory treatment as to amount to no treatment at all.

No genuine issue of material fact exists for trial concerning the adequacy of the medical care Hawkins provided Watson on March 4, 2012.  Defendant Hawkins was not deliberately indifferent to a serious medical need.  Therefore, Hawkins is entitled to summary judgment on Watson's Eighth Amendment claim arising from the medical treatment he received on March 4, 2012.  This conclusion also forecloses Watson's Eighth Amendment claims against Defendants Edelen and Rogers arising from Hawkins's provision of medical treatment on March 4, 2012.

D.      Limitation on Recovery

Watson seeks compensatory damages for physical and emotional injuries he suffered as a result of Defendants' conduct (doc. 33 at 19, 21).  He also seeks punitive and nominal damages (*id.*).  Defendants argue that, pursuant to 42 U.S.C. § 1997e(e), Watson may not recover compensatory or punitive damages because, at most, Watson's physical injuries were only *de minimis* in nature.

Title 42 U.S.C. § 1997e(e) provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  The Eleventh Circuit has decided that the phrase "Federal civil actions" means all federal claims, including constitutional claims.  Napier v. Preslicka, 314 F.3d 528, 532 (11th Cir. 2000) (citation omitted).  Where a prisoner plaintiff alleges constitutional violations he is prevented under § 1997e(e) from seeking punitive or compensatory damages in the absence of a physical injury.  Smith v. Allen, 502 F.3d 1255, 1271 (11th Cir. 2007) *abrogated on other grounds by* Sossamon v. Texas, — U.S. —, 131 S. Ct. 1651, 179 L. Ed. 2d 700 (2011)); *see also* Al-Amin v. Smith, 637 F.3d 1192, 1199 (11th Cir. 2011) (noting that Napier court, by affirming dismissal of Napier's entire claim, "concluded, albeit *sub silentio*, that Napier's

punitive claim was barred by § 1997e(e) just as much as his compensatory claim.").   Nominal damages, however, may still be recoverable.   Smith, 502 F.3d at 1271.

"In order to avoid dismissal under § 1997e(e), a prisoner's claims for emotional or mental injury must be accompanied by allegations of physical injuries that are greater than *de minimis*." Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309, 1312–13 (11th Cir. 2002).   In Harris v. Garner, the Eleventh Circuit stated, "We therefore join the Fifth Circuit in fusing the physical injury analysis under section 1997e(e) with the framework set out by the Supreme Court in Hudson for analyzing claims brought under the Eighth Amendment for cruel and unusual punishment, and hold that in order to satisfy section 1997e(e) the physical injury must be more than *de minimis*, but need not be significant." 197 F.3d 1279, 1286 (11th Cir. 1999), *reh'g en banc granted and opinion vacated*, 197 F.3d 1059 (11th Cir. 1999), *opinion reinstated in relevant part en banc*, 216 F.3d 970 (11th Cir. 2000).   Under binding circuit precedent, this court therefore must "fus[e] the physical injury analysis under section 1997e(e) with the framework set out by the Supreme Court in Hudson for analyzing claims brought under the Eighth Amendment for cruel and unusual punishment."  *Id.*

As previously discussed, Watson states in his verified declaration that for several months after the March 1, 2012 incident, he suffered numbness in his right hand, left knee, and both feet. He also states he began suffering syncope episodes, for which he apparently is still being treated. He alleges as a result of the application of chemical agents on March 4, 2012, he suffered intense pain, vomiting, loss of consciousness, a burning sensation for at least one week, and chemicals burns to the skin on his genitals, buttocks, arms, face, back, legs, and stomach, which caused blisters and peeling skin.  Accepting those allegations as true, Watson's physical injuries are not *de mimimis* as a matter of law.  Specifically with regard to the physical injury resulting from the multiple uses of chemical agents (*i.e.*, loss of consciousness, burning sensation on his skin that lasted at least a week, and chemical burns to the skin on his genitals, buttocks, arms, face, back, legs, and stomach, which caused blisters and peeling skin), Watson's allegations edge his physical injuries over the line of legally insignificant.  *Cf.* Thompson v. Quinn, No. 3:11cv533/RV/EMT, 2013 WL 2151715, at *12 (N.D. Fla. May 16, 2013) (unpublished) (prisoner failed to show more than a *de minimis* physical

injury resulting from officer's use of chemical agent and was therefore subject to § 1997e(e)'s prohibition on compensatory and punitive damages, where only allegation of physical injury was burning sensation on this body); Magwood v. Tucker, No. 3:12cv140/RV/CJK, 2012 WL 5944686, at *5 (N.D. Fla. Nov.14, 2012) (unpublished) (prisoner failed to show more than a *de minimis* physical injury resulting from officer's use of chemical agent, and therefore could not recover compensatory or punitive damages, where he alleged he suffered bloody nose and bloody phlegm), *Report and Recommendation Adopted By*, 2012 WL 5944657 (N.D. Fla. Nov. 28, 2012); Robinson v. Tifft, No. 3:11cv560/LAC/CJK, 2012 WL 2675467, at *2 (N.D. Fla. June 1, 2012) (unpublished) (prisoner failed to show more than a *de minimis* physical injury resulting from officer's use of chemical agent, for purposes of § 1997e(e), where he alleged he suffered "involuntary closing and burning sensation" in his eyes and was temporarily blinded), *Report and Recommendation Adopted By*, 2012 WL 2675469 (N.D. Fla. July 6, 2012); Kornagay v. Burt, No. 3:09cv281/LAC/EMT, 2011 WL 839496 (N.D. Fla. Feb. 8, 2011) (unpublished) (finding that prisoner failed to show more than a *de minimis* physical injury resulting from officer's use of a total of 109 grams of OC chemical agent, applied in three one-second bursts, where prisoner alleged he suffered burning lungs and skin, congested breathing, tearing eyes, nasal discharge, dizziness, the sensation of respiratory distress, choking, and burns to his scalp; also noting that OC is biodegradable and, unlike chemical irritants—which are pain inducers and tearing agents—does not linger in clothing or affected areas, causes an incapacitating inflammatory response, pain and irritation of the mucous membranes of the eyes, nose, and lining of the mouth, as well as pulmonary irritation and prolonged coughing, but does not require post-application treatment beyond proper ventilation and water for flushing the eyes and skin, and has no known long-term effects), *Report and Recommendation Adopted By*, 2011 WL 855619 (N.D. Fla. Mar. 9, 2011)[19]; Beecher v. Jones, No. 3:08cv416/MCR/EMT, 2010 WL

---

[19] *See also* Thomas v. McNeil, No. 3:04-CV-917-J-32JRK, 2009 WL 64616, at *3 & 22 n.44 (M.D. Fla. Jan. 9, 2009) *judgment entered*, No. 3:04-CV-917J32JRK, 2009 WL 605306 (M.D. Fla. Mar. 9, 2009) *aff'd sub nom.* Thomas v. Bryant, 614 F.3d 1288 (11th Cir. 2010) *and  aff'd sub nom.* Thomas v. Bryant, 614 F.3d 1288 (11th Cir. 2010) (noting generic name for OC is "pepper spray" and that it is the FDOC's most commonly used and least dangerous chemical agent; also noting that pursuant to FDOC protocol, if an inmate fails to comply with a correctional officer's order after two "three one-second bursts" of OC have been administered, "a third round of chemical agents is administered, this time using a stronger chemical agent (orthochlorbenzal malononitrile ("CS"), sometimes called tear gas)") (emphases added).

5058555, at *5–6 (Oct. 29, 2010) (unpublished) (finding that prisoner who alleged no physical injury arising from use of chemical agents failed to show requisite physical injury under § 1997e(e)), *Report and Recommendation Adopted By*, 2010 WL 5055991 (N.D. Fla. Dec. 6, 2010); Jennings v. Mitchell, 93 F. App'x 723, 725 (6th Cir. 2004) (unpublished) (finding that prisoner who suffered the discomfort of pepper spray had shown only *de minimis* injury, insufficient to satisfy § 1997e(e)). Therefore, Watson's claims for compensatory and punitive damages against Defendants in their individual capacities survive the bar of § 1997e(e) at this stage of the case.[20]

VI.    CONCLUSION

Viewing the evidence in the light most favorable to Watson, the non-movant, the court finds that Defendants are entitled to summary judgment on Watson's Eighth Amendment claims of deliberate indifference to serious medical and mental health needs.  However, a genuine dispute of material fact exists which precludes summary judgment for Defendants Edelen and Johnson regarding the use of force on March 1, 2012, and Defendants Edelen and Rogers regarding the application of chemical agents on March 4, 2012.  Additionally, Watson's claims for compensatory and punitive damages against Defendants in their individual capacities survive the bar of § 1997e(e) at this stage of the case.

Accordingly, it is respectfully **RECOMMENDED**:

That the motion for summary judgment filed by Defendants (doc. 124) be **GRANTED IN PART AND DENIED IN PART AS FOLLOWS:**

1.    Defendants' motion for summary judgment (doc. 124) be **DENIED** as to Plaintiff's Eighth Amendment claims against Defendants Edelen and Johnson regarding the use of force (*i.e.*, slamming Watson onto the concrete face first, striking his head, nose, back, and feet, and twisting his wrists and fingers) on March 1, 2012;

---

[20] Watson states he is suing Defendants in their individual capacities only (doc. 33 at 17–18).  To the extent Watson would seek to sue Defendants in their official capacities for damages, however, such suit would be barred by the Eleventh Amendment.  *See* Miller v. King, 384 F.3d 1248 (11th Cir. 2004) (a plaintiff may not bring a § 1983 action for monetary damages against the state or state officials in their official capacities).  Absent waiver or express congressional abrogation, the Eleventh Amendment prohibits a suit brought by a private individual against a state in federal court.  *See* Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 765–78, 122 S. Ct. 1864, 152 L. Ed. 2d 962 (2002); Kentucky v. Graham, 473 U.S. 159, 167 n.14, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985); Gamble v. Fla. Dep't of Heath and Rehab, Serv., 779 F.2d 1509, 1511 (11th Cir. 1986).  A suit against a state employee in his official capacity is deemed to be a suit against the state for Eleventh Amendment purposes.  Will v. Mich. Dept. of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989).

2.     Defendants' motion for summary judgment (doc. 124) be **DENIED** as to Plaintiff's Eighth Amendment claim of excessive force against Defendants Edelen and Rogers regarding the use of force (*i.e.*, three applications of chemical agents) on March 4, 2012;

3.     Defendants' motion for summary judgment be **DENIED** as to Plaintiff's claims for compensatory and punitive damages related to the uses of force of March 1 and 4, 2012;

4.     Defendants' motion for summary judgment be **GRANTED** as to Plaintiff's remaining claims; and

5.     Defendant Hawkins be **DISMISSED** from this action.

At Pensacola, Florida, this 18th day of November 2014.


/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**